IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                            )
CONCERNED ROSEBUD AREA CITIZENS, *et al.*   )
                                            )
    Plaintiffs,                             )
                                            )
        v.                                  )  Civ. No. 05-1275 (JR)
                                            )
NORTON, *et al.*,                           )
                                            )
    Defendants,                             )
                                            )
_____)

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, TO TRANSFER VENUE**

**FACTUAL BACKGROUND**

This is the second of two cases filed by Plaintiffs ("Concerned Citizens") in this Court challenging the approval by the Department of the Interior's Bureau of Indian Affairs ("BIA") of a lease authorizing construction of a large, commercial hog production facility ("hog farm") on the Rosebud Sioux reservation – in South Dakota. The BIA initially approved the lease for the hog farm in September of 1998; two months later Concerned Citizens sued to overturn that decision, arguing chiefly that the lease had been approved in violation of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., because the BIA failed to prepare an environmental impact statement ("EIS") concerning the project.

Some two months after the filing of that lawsuit ("*Concerned Citizens I*"), BIA acknowledged to this Court that it had, in fact, violated NEPA, and it agreed to stop the project. *See* Exh. 1 (settlement agreement). Before doing so, however, BIA moved to transfer the case to the District of South Dakota, arguing that venue was appropriate in South Dakota because virtually all of the agency decisionmaking at issue had taken place there. *See* Defendant's Motion to Transfer Venue to the District of South Dakota (filed January 11, 1999), *Concerned Rosebud Area Citizens v. Babbitt*, D.D.C. No. 98-2841 (JHG). Judge Green rejected the motion to transfer, opining that this District was well-suited to host the case because it would be decided on the basis of an administrative record:

> ... a reading of the complaint demonstrates that the lease-validity issue, which the Government concedes must be decided on the record alone, is the issue for which injunctive relief is sought. Concerned Citizens seek a series of declarations that the Government has violated a number of provisions of law followed by injunctive relief suspending the lease approval. In fact, it appears that even the so-called "injunctive" relief sought is really just another declaratory judgment adjudging the lease to be void. However styled, the parties agree that the basis for granting relief must be found only in the administrative record.
>   ... Plaintiffs seek a backward-looking review of an administrative process that is complete and has resulted in a final decision. It may be that if this Court grants the relief sought, subsequent litigation may erupt in South Dakota, and it may well be that the interested groups will wish to be heard further on the merits of the agency's decision. But those concerns should be addressed to the agency, because, as has been conceded, this Court is concerned only with a record that is closed.

Within the next few weeks, BIA halted construction of the hog farm and agreed to prepare an EIS. Concerned Citizens and BIA filed a settlement agreement; Judge Green dismissed the case without prejudice.

The builders/owners/operators of the factory hog farm ("factory hog farmers") are two commercial entities from, respectively, North Dakota - Bell Farms – and Nebraska - Sun Prairie. Instead of intervening in the *Concerned Citizens 1* lawsuit and moving to transfer the case to

South Dakota or North Dakota or Nebraska, the factory hog farmers did nothing until the government defendants had confessed liability and joined in the settlement agreement. Three business days later, they filed an utterly meritless complaint in the District Court for South Dakota in an effort to subvert the agreement that had been approved by Judge Green.[1] After that case was ordered dismissed by the Eighth Circuit Court of Appeals due to the factory hog farmers' failure to set forth a single cognizable legal theory,[2] the factory hog farmers sued BIA again (and the Rosebud Sioux Tribe, which was now fighting the project), this time seeking money damages and advancing an array of new but equally spurious legal theories.[3] This second case was never prosecuted. Two years after it was filed, no discovery had been sought. Indeed, no Answer had even been filed. When the final settlement was entered, an administrative record had never been prepared. No evidentiary hearing was ever conducted.

Although, as noted by the government in its motion, the settlement agreement in *Sun Prairie v. Cason* states that "the BIA reserves the right to review prior NEPA documentation and to supplement it..." nothing **obligates** BIA to remedy its admitted 1998 violation of NEPA.

---

[1] The Complaint failed to set forth a single claim for relief. *See Rosebud Sioux Tribe v. McDivitt*, D.S.D. Civ. No. 99-3003.

[2] Among other creative legal theories, the factory hog farmers attempted to ground their case in the National Historic Preservation Act. *See Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031 (8th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).

[3] For example, Count Two of the Complaint asserted that "Sun Prairie has been denied of its expectation and right to finality of government action and its right to protection from arbitrary, oppressive and self-serving government conduct consistent with the guarantees of substantive Due Process." Count Three asserted that "Federal Defendants' conduct violates the Fifth Amendment of the United States Constitution by impairing the obligation of contracts to which it is a party."

Seeking to enforce their rights under NEPA and the settlement in *Concerned Citizens I*, Plaintiffs filed this case - *Concerned Citizens II*.

## ARGUMENT

### I. Venue in this District is Undeniably Proper

Venue is appropriate where either (1) any defendant resides, (2) "a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated," or (3) any plaintiff resides. 28 U.S.C. § 1391(e). Because the federal Defendants reside in Washington, D.C., the District for the District of Columbia is clearly a proper venue for this litigation. Second, as discussed fully below, "a substantial part of the events or omissions giving rise to the claim" occurred in Washington, D.C. Because two of the three § 1391 factors – any one of which is sufficient for venue purposes – are satisfied here, venue in the District of Columbia is proper. Defendants' argument to the contrary, Motion at 2, is puzzling and clearly misplaced.

### II. Transferring this Case to South Dakota would be Inappropriate and Unjust

#### A. Legal Standards

Defendants' motion to transfer is based on 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it may have been brought." When a genuine choice of venue exists, the decision to transfer must be made "according to an 'individualized, case-by-case consideration of convenience and fairness.'" Steward Organization, Inc. v. Ricoh Corp., 487 U.S. 22, 29 (1988). "In exercising its broad discretion under section 1404(a), the court must balance a number of case-specific factors which include

the private interests of the parties as well as public interests such as efficiency and fairness." *Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000). The private interest considerations include:

> (1) the plaintiffs' choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendants' choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses . . ., but only to the extent that the witnesses may actually be unavailable for trial in one of the fora; and (6) the ease of access to sources of proof. Id. (internal citation and quotation marks omitted ).

In addition, the public interest considerations include:

> (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home.

*Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 12 (D.D.C. 2000), *Nichols v. United States Bureau of Prisons*, 895 F. Supp. 6, 8 (D.D.C. 1995).

A decision to transfer under § 1404(a) "must be based on the particular facts and circumstances of a case, and a defendant wishing to upset Plaintiff's choice of forum must demonstrate a need for transfer with particularity." *Ross v. United States,* 641 F. Supp. 368, 377 (D.D.C. 1986).

**B.    Plaintiff's Choice of Venue Is Entitled to Deference**

When considering whether to transfer a case, a court must weigh the factors set forth in § 1404(a) against "the longstanding principle that the Plaintiff's choice of forum *rarely* should be disturbed." *Vencor Nursing Centers, L.P. v. Shalala*, 63 F. Supp. 2d 1, 6 (D.D.C. 1999); *Dooley*

*v. United Tech. Corp.,* 786 F. Supp. 65, 82 (D.D.C. 1992) (emphasis added). In other words, for Defendants to succeed, they must meet "the heavy burden of establishing that Plaintiff[s'] choice of forum is inappropriate." *Lifschitz & Shapiro v. Hazard,* 24 F. Supp. 2d 66, 71 (D.D.C. 1998). *See also Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981) ("*there is ordinarily a strong presumption in favor of the plaintiff's choice of forum*, which may be overcome only when the private and public interest factors <u>clearly</u> point towards trial in the alternative forum.") (emphasis added); <u>In re Scott</u>, 709 F.2d 717, 720 (D.C. Cir. 1983) (explaining that a court should "accord[ ] [plaintiff's] forum choice substantial weight" in evaluating a transfer motion).

"Although the Court has broad discretion to adjudicate motions to transfer under § 1404(a), the Court may not transfer a case from Plaintiff's chosen forum simply because another forum, in the court's view, may be superior to that chosen by Plaintiff*.*" *Dooley,* 786 F. Supp. at 82 (citing *Pain v. United Techs. Corp.,* 637 F.2d 775, 783 (D.C. Cir. 1980)). "It is almost a truism that a Plaintiff's choice of forum will rarely be disturbed and, so far as the private interests of the litigants are concerned, it will not be unless the balance of convenience is strongly in favor of the defendant." *Id.* (quoting *Gross v. Owen,* 221 F.2d 94, 95 (D.C. Cir. 1955)).

The burden is on the party moving to transfer to show that "the balance of convenience of the parties and witnesses and the interest of justice are in its favor." *Chung v. Chrysler Corp.,* 903 F. Supp. 160, 164 (D.D.C. 1995). *See also Joyce v. Eastern Concrete Paving Co.*, 1996 WL 762323 (D.D.C. 1996) (deference normally paid to plaintiff's choice of forum); *Asia North America Eastbound Rate Agreement v. Pacific Champion Service Corp.*, 864 F. Supp. 195, 199 (D. D.C. 1994) (same); *Air Line Pilots Ass'n v. Eastern Air Lines*, 672 F. Supp. 525, 526 (D.

D.C. 1987) (plaintiff's choice of forum is given "paramount consideration"); *Int'l Brotherhood of Painters and Allied Trades Union v. Best Painting and Sandblasting Co.*, 621 F. Supp. 906, 907 (D. D.C. 1987) ("plaintiff's choice of forum is due substantial deference, and, unless the balance of convenience is strongly in favor of the defendants, should rarely be disturbed"). Defendants have not met this burden.

Concerned Citizens have deliberately chosen this forum as the most convenient. As the court held in National Ass'n for the Advancement of Colored People v. Levi, 418 F. Supp. 1109, 1113 (D. D.C. 1976), "[t]he plaintiffs have made what is presumed to be a considered and deliberate choice of forums. Their choice is entitled to serious consideration and should not be disturbed absent a strong showing that their chosen forum is completely inappropriate and inconvenient."

C.  **The Private Interests of the Parties Favor Retaining the Current Action in This District.**

A review of the "private interest" factors weighs heavily in favor of Plaintiff's choice of forum.

(1)(2)  The Litigants' Respective Choices

First and second, as stated above, Plaintiffs' choice of forum (which is due substantial deference) is in Washington, D.C., and Defendants' choice of forum is in South Dakota..

(3) The Critical Agency Decisions were Made in Washington by Headquarters Officials

Defendants assert in their motion that "[a]s a threshold matter, it is beyond dispute that in this civil action against a governmental agency and government officials, the events giving rise to plaintiffs' lawsuit occurred in South Dakota." Motion at 8. They also claim that "most of the BIA officials likely to have relevant knowledge relating to this matter are found in South

Dakota." Motion at 10 n. 7. Neither of these claims is substantiated, a shortcoming which, in and of itself, is fatal to the government's motion.[4/] More importantly, the government's claims are false. In reality, the decisions to review, rescind, and then reinstate BIA's approval of the lease were all made in Washington by officials from BIA and, evidently, many other agencies.

The lease was determined to be acceptable to South Dakota BIA officials on September 16, 1998, the date when it was signed by BIA's local representative, Cora Jones. *See* Exh. 2, p. 30. Jurisdiction over the matter was immediately transferred to BIA Headquarters, where the Assistant Secretary's Senior Advisor, Ms. Elizabeth Bell, assumed personal and full control over the agency's handling of the matter. From September of 1998 through January of 1999 – when the lease approval was rescinded and BIA's violation of NEPA was admitted – Ms. Bell assembled and reviewed the administrative record; communicated directly with the Tribal President, the chief executive of the factory hog farmers, and all other principals; and arranged for meetings and discussions between all parties and the Assistant Secretary. *See* Exh 3, which is Ms. Bell's personal recounting of her extensive involvement in and management of the decisionmaking in this case, beginning in the last two weeks of September, 1998 – contemporaneously with the last recorded decision or act by any BIA official in South Dakota.

---

[4/] Defendants have the burden of identifying potential fact witnesses. *See Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir. 1978), rev'd on other grounds 652 F.2d at 278 ("When a party seeks to transfer on account of the convenience of witnesses under § 1404(a), he must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover"); Crawford v. Glenns, Inc., 637 F.Supp. 107, 110 (N.D. Miss. 1986) ("With regard to the convenience of party and non-party witnesses, the defendants must specifically relate the identity of the witnesses and the nature and relative importance of their testimony").

Ms. Bell engaged in repeated substantive conversations and correspondence with counsel for the Tribe. *See* Exh. 4. She traveled to the construction site and held substantive face-to-face meetings with the factory hog farmers. *See* Exh. 5. When technical consultants from the private sector or the Environmental Protection Agency produced dense reports containing technical specifications for the proposed hog farm, they were mailed to staff at BIA Headquarters, not to the regional office. *See* Exh. 6, p. 2; Exh. 7, 8, 9.

The decision of BIA Director ("Assistant Secretary") Gover to place Ms. Bell and other Headquarters staff in charge of the lease review and associated NEPA issues reflected Mr. Gover's intent to make the central decisions himself. He met personally with Tribal President Wilson to discussion the hog farm, the lease, and NEPA. *See* Exh. 10. Remarkably, the Assistant Secretary himself received technical reports from BIA consultants. *See* Exh. 11.

Because of the national importance of the issues presented by this particular project, much of the responsibility for making the requisite NEPA determinations was shared with the President's Council on Environmental Quality ("CEQ"), which is statutorily charged with overseeing the government's NEPA compliance on a nationwide basis. 42 U.S.C. § 4341. On a number of occasions, CEQ convened as many as a dozen federal agency offices to assist in making the decision on the Rosebud hog farm lease. *See* Exh. 12, pp. 3-5. This indicates that the administrative record in this case lies not merely in the offices of BIA Headquarters, but also in the offices of EPA, the Department of Justice, and the Executive Office of the President.

Ultimately, it was apparently Assistant Secretary Gover who made the decision to rescind BIA's approval of the lease. *See* Exh. 13. Whether this determination was actually made in the office of the Secretary of the Interior – or the White House – cannot not be ascertained in the

absence of a complete administrative record. But it is clear that the key decision in January of 1999 was made in Washington, not South Dakota.

All subsequent decisionmaking was similarly made in Washington. BIA officials in South Dakota understandably took a "hands off" posture with respect to the hog farm after the District Court for South Dakota issued an injunction. *Rosebud Sioux Tribe v. Gover*, 104 F. Supp. 2d 1194 (D. S.D. 2000), *reversed Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031 (8th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003). In Washington, however, lobbying and political pressure continued to be applied to BIA Headquarters regarding the hog farm. *See* Exh. 14. Finally, when the May, 2005 settlement agreement was finalized, it was executed not by BIA officials in South Dakota, but by the Assistant Secretary himself and an attorney from the Department of Justice. *See* Exh. 1 to Defendants' Motion to Transfer.

(4) The Convenience of the Parties Favors the District of Columbia

Plaintiffs' counsel practices law in the District of Columbia. If the case were transferred to the District of South Dakota, Plaintiff would have to pay a second attorney to represent them there, and would have to travel to that state. Given that Plaintiffs are non-profit organizations with limited resources, the added financial burdens from a transfer to South Dakota militate against such transfer. *See Gemological Inst. of Am. v. Thai Dai Phan,* 145 F. Supp. 2d 68, (D.D.C. 2001) ("A court may properly consider in assessing the interest of justice the relative ability of the parties to bear the expenses of litigating in a distant forum.") (internal citations omitted). In addition, all counsel for the government are located in Washington.

(5) (6)  The Convenience of the Witnesses Favors the District of Columbia

Fifth and Sixth, this case does not raise any serious issues relating to the convenience of witnesses or sources of proof.  Because this case will be argued and decided on the administrative record, Plaintiffs intend to move for summary judgment based on documentary evidence.  This will obviate witnesses.  *See The Wilderness Society v. Babbitt*, 104 F. Supp. 2d 10, 15 (D.D.C. 2000) (Roberts, J.)  .  As explained in a case involving a massive record:

> [n]o matter where the litigation proceeds, these materials will have to be photocopied and shipped to [Plaintiff's] lawyers who live and work in the District area . . . .  Once the material is photocopied, boxed, and sent to the District, *it would not be a substantially greater hardship to send an additional copy of these documents to the courthouse.*

*Air Line Pilots Ass'n v. Eastern Air Lines,* 672 F. Supp. at 527 (emphasis added).

The administrative record that supported the September 16, 1998 decision of the BIA's South Dakota representative has already been compiled and shipped to Washington.  *See Rosebud Sioux Tribe v. Gover*, 104 F. Supp. 2d 1194, 1198 (D.S.D. 2000) ("The administrative record related to the project EA and FONSI was received by the Department of Justice on January 25 and 26, 1999.")  All that needs to be added are those documents supporting the crucial final agency actions – these were generated in Washington, in the offices of BIA, CEQ, EPA, etc.  The handling of the record thus provides no grounds for transferring the case.

D.   **The Public Interest Favors Retaining this Action in This District.**

The interest-of-justice factor relates to the "efficient functioning of the courts" and contemplates matters such as (1) the familiarity of the court with the applicable law, (2) relative congestion of the courts' calendars, and (3) the local interest in deciding local controversies at

home. *Lifschitz & Shapiro v. Hazard,* 24 F. Supp. 2d 66, 71 (D.D.C. 1998). The "interest of justice" is a separate component of a § 1404(a) transfer analysis and may be determinative even if the convenience of the parties and witnesses might call for a different result. *Coffey v. Van Dorn Iron Works,* 796 F.2d 217, 220 (7th Cir. 1986); 15 Wright & Miller, *Federal Practice and Procedure,* §3854, pp. 439-40 (2d ed. 1986). Here, the interests of justice support the retention of this case in Washington.

(1)     The District of South Dakota is not more familiar with the specific factual and legal issues

This case was first filed in this District in 1998 - "Concerned Citizens I." The government acknowledged that venue was proper, and the Court adjudicated the question of transfer of venue. This Court therefore had jurisdiction over this matter well before the District Court for South Dakota arguably acquired any related jurisdiction.[5/]

The litigation which subsequently arose in South Dakota was only indirectly related to this case. The parties were wholly different. In the first of the two complaints filed in the District Court, Sun Prairie and the Tribe (neither of which were parties to the *Concerned Citizens I* litigation) sued BIA. The Concerned Citizens were not named. Further, the legal issues presented in South Dakota were completely unrelated to the NEPA claims advanced in

---

[5/] *Cf. Coady v. Ashcraft & Gerel*, 223 F.3d 1, 11 (1st Cir. 2000). ) (district courts considering transfer should consider not only the convenience of the parties and witnesses but also "the ... order in which the district court obtained jurisdiction," *citing Cianbro Corp. v. Curran-Lavoie, Inc.*, 814 F.2d 7, 11 (1st Cir. 1987)).

*Concerned Citizens I* and in the present action. In fact, as mentioned above, no valid legal claims were ever raised in the first South Dakota action.

In the second South Dakota action – filed after the first case was dismissed by the 8th Circuit, Sun Prairie and Bell Farms (which had not been a party to any previous action) sued BIA and the Rosebud Tribe for **money damages**, raising a host of constitutional and contract claims. This had nothing whatsoever to do with the environmental impact of the project, or with BIA's noncompliance with NEPA. Moreover, this lawsuit was assigned not to Judge Kornmann (who decided the first South Dakota case) but to Judge Battey. Therefore, to the extent that Judge Kornmann was familiar with the facts or law of the case, that familiarity was lost when his decision was reversed and the second action filed. Judge Battey is even less familiar with the case than Judge Kornmann, as he has held no evidentiary hearing, and received no dispositive motions. Only motions to dismiss have been decided.

In sum, the facts and law of the South Dakota cases share only one aspect with this case - they involve the hog farm. In all material respects they are commercial disputes that do not implicate the questions of administrative law raised in this case.

(2)     This Court is more familiar with the relevant general legal issues

Unlike the District of South Dakota, the courts of this District and Circuit have great familiarity with the applicable law in this case. *See Concerned Rosebud Area Citizens v. Babbitt*, 34 F. Supp. 2d 775, 776 (D.D.C. 1999) ("[T]he issue . . . is solely whether the federal government complied with federal law, and that is the kind of question that is routinely and properly answered in this District and Circuit.").

In fact, this Court has flatly rejected similar motions to transfer environmental matters on numerous occasions. For example, this Court rejected an attempt by the Department of Agriculture to have a case transferred to Montana simply because the animals at issue, some of the Plaintiff, and some of the agency actors were all located in Montana. *See Greater Yellowstone Coalition v. Bosworth*, 180 F. Supp. 2d 124 (D.D.C. 2001). This Court explained that, because "two of the five Plaintiff . . . have offices in the District of Columbia," because "both of the Plaintiff's counts focus on interpretation of federal statutes," and because "this case has some national significance," transfer was inappropriate. *Id.* at 128-29.

Similarly, in *The Wilderness Society v. Babbitt*, 104 F. Supp. 2d 10 (D.D.C. 2000), this Court rejected an attempt by the Department of the Interior to transfer an environmental action to Alaska simply because the federal lands at issue, some of the agency officials, and some of the environmental Plaintiff were located in Alaska. 104 F. Supp. 2d at 13. Likewise, in *National Wildlife Federation v. Westphal,* this Court rejected the Corps' motion to transfer a CWA permit challenge to Mississippi because "the Corps' statutory headquarters are located in the District," and because "this court routinely reviews agency decisions sought under the APA." No. CIV.A. 98-2700, 1999 WL 1567731, at *1 (D.D.C., Mar. 3, 1999).

Research reveals only one case under NEPA that has been decided by the District of South Dakota since the beginning of this decade - the very *Sun Prairie* case in which the plaintiff was determined not to have fairly raised any NEPA claims. *Rosebud Sioux Tribe v. Gover*, 104 F. Supp. 2d 1194 (D. S.D. 2000), *reversed, Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031 (8th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).

In contrast, almost one hundred such cases have been adjudicated in this District. In short, as confirmed by the abundance of case law in this District and the paucity of NEPA decision emanating from South Dakota, it is entirely appropriate that this case be retained in Washington.

**C.    While both Districts are busy, the District of South Dakota is more congested than the District Court of D.C.**

While both districts are busy, the caseload congestion is greater in the District of South Dakota. *See* U.S. District Court Judicial Caseload Profile Report, available at http://www.uscourts.gov/cgi-bin/cmsd2004.pl (viewed on October 13, 2005). *See* Exhs.15 (D.S.D.) and 16 (D.D.C.). In fact, from October 1, 2003 through September 30, 2004 (the most recent statistics available), each judge within the D.C. District had an average weighted filing[6] score of 261, whereas the average judge in the District of South Dakota had a weighted score of 333. *Id.* Similarly, the median time for resolving a civil matter in D.C. was 10.3 months, and 11.8 months in South Dakota. Thus, this public interest factor also favors denial of Defendants' motion to transfer.

**II.    Plaintiffs Have No Legal Obligation under the South Dakota Settlement Agreement**

In the "Procedural History" section of its brief, as opposed to the Argument, the government implies that the terms of the May, 2005 settlement agreement ("2005 Settlement

---

[6] According to the U.S. Courts web page, the federal Judiciary applies weights to filings in the U.S. district courts to account for the different amounts of time judges require to resolve various types of action. The total "weighted filings" is the sum of all weights assigned to civil cases and to felony defendants. *See* http://www.uscourts.gov/library/fcmstat/cmsexpl04.html

Agreement) somehow operate to require this case to be transferred to South Dakota. This represents a great distortion of the terms of that agreement.

The suit that was resolved by that agreement was an action for damages invoking the U.S. Constitution and state contract law. The suit had nothing to do with environmental law, and the Concerned Citizens were never named as a party (a similar but different group of citizens and non-profit organizations did intervene for limited purposes). Despite the government's claim, Motion at 4, that "the parties engaged in concerted efforts to negotiate a settlement," those efforts did not involve the Concerned Citizens. Indeed, the negotiated settlement document was never shared with the Concerned Citizens until it had been agreed to by the "parties."

None of the plaintiffs in this case were a party to the 2005 settlement agreement. The agreement defines the "Parties" as "[t]he Plaintiffs, Federal Defendants, and the Tribe." Id. at ¶ 4, p. 3. There can thus be no argument that the Plaintiffs in this case are in any way bound by the commitments entered into by the "Parties" to the 2005 settlement agreement.[7]

### III.   The Cases Cited by Defendants' Are Distinguishable

Defendants' reliance on *Noxell Corp. v. Firehouse No. 1 Bar-B-Que Restaurant*, 760 F.2d 312 (D.C. 1985) is misplaced. In that case the defendant resided 2,500 miles from this District. Venue was thus not established. In this case the defendants reside here. Venue is clear.

---

[7] Though an opportunity to comment on the 2005 settlement agreement was made generally available, the Concerned Citizens elected not to do so. Their chief legal concern with the settlement involved NEPA compliance. However, NEPA issues had not been raised in the case, either offensively or defensively. The District Court lacked jurisdiction over the defendants to order relief under NEPA. Raising issues under NEPA would have made no more sense than raising issues under the National Historic Preservation Act; such claims had already been removed from the litigation by the 8th Circuit Court of Appeals. *See Rosebud Sioux Tribe v. McDivitt*, 286 F.3d 1031, 1039 (8th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).

Second, Defendants cite *Hawksbill Sea Turtle v. FEMA,* 939 F. Supp 1 (D.D.C. 1996). In that case, however, a prior action had been filed in the Virgin Islands, in which the Virgin Islands district court heard three days of evidentiary testimony and oral argument and had extensive evidentiary hearings. Moreover, all Plaintiffs and Plaintiff's lead counsel were located in the Virgin Islands. 939 F. Supp. at 3. Finally, *Hawksbill* did not involve claims that could be resolved solely on the administrative record, and thus convenience of witnesses was a factor. *Id.* at 6. None of these factors are present in this case.

Next, Defendants cite *Trout Unlimited v. U.S. Department of Agriculture,* 944 F. Supp. 13 (D.D.C. 1996), noting that the Court deferred "to the more compelling interest of the State of Colorado" in having this case decided locally. That case, too, is distinguishable on multiple grounds. First and foremost, this Court transferred that case largely because it involved the "interpretation of [Colorado] state law." 944 F. Supp. at 19. Furthermore, in *Trout Unlimited* Plaintiff had counsel in Colorado and offered no facts suggesting that they would be inconvenienced by a transfer there. *Id.* at 18. In this case, neither of these factors apply.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to transfer venue to the District of South Dakota should be denied.

Respectfully submitted,
James B. Dougherty
D.C. Bar No. 939538
709 3rd St. SW
Washington DC 20024
(202)488-1140 (voice)
(202)484-1789 (fax)

Counsel for Plaintiffs