345 54214

# LAND LEASE

THIS LAND LEASE (this "Lease") is entered into this 8th day of September, 1998, between the ROSEBUD SIOUX TRIBE , a federally recognized Indian tribe (the "Tribe"), and SUN PRAIRIE, a Nebraska General Partnership (the "Lessee").

This Lease is being entered into by the Tribe pursuant to the authority contained in Resolution No. 98-203, adopted by the Tribal Council of the Tribe on August 19, 1998, (the "Resolution") for the purpose of enabling the Lessee to obtain financing by the issuance of certain debt instruments to be secured by a leasehold mortgage and other loan and security documents covering the Premises, as hereinafter defined, and permitting the Lessee to work with and in cooperation with the Tribe, to develop, design, construct, equip and operate a pork production facility (the "Project"), as hereinafter further defined and described, using the proceeds of the financing obtained by the Lessee as well as Lessee's resources, all to promote the economic development and general welfare of the Tribe.

1.    Definitions.

(a)    "Additional Rent" shall mean the Additional Rent to be paid by Lessee pursuant to paragraph 9(c) hereof.

(b)    "Gross Revenues" shall mean all revenues of every kind, nature and description at any time hereafter derived for the benefit of Lessee from the use or operation of the Premises or the Project, insurance proceeds, eminent domain proceeds, the proceeds of any financing of the Project and except for any reimbursement to Lessee from any source of capital costs paid or incurred by Lessee for or in connection with the Project. Any payments which Lessee is required to make to packers, meat packers, slaughterers and Mountain Prairie LLC and their respective successors and assigns pursuant to supply, sale and other operating agreements with Lessee for or relating to the operation of the Project shall be excluded and deducted from Gross Revenues. The Tribe acknowledges receipt of copies of said agreements from Lessee.

(c)    "Management Agreement" shall mean the Management Agreement approved by the Tribe, entered into between Lessee and Bell Farms LLP, a North Dakota Limited Liability Partnership ("Bell") in the form of Exhibit A attached hereto and made a part hereof.

Drafted by:    Dorsey & Whitney LLP
220 South Sixth Street
Minneapolis, MN  55406-3443

EXHIBIT 26

(d)    "Manager" shall mean Bell as Manager under the Management Agreement.

(e)    "Net Profits" shall mean the Gross Revenues less all costs and expenses (collectively "Operating Expenses") paid or incurred by Lessee for or in connection with the use or operation of the Project and the Premises, including without limitation within Operating Expenses the following costs and expenses to be subtracted from Gross Revenues to calculate Net Profits: all debt service and other payments made to any Permitted Mortgagee; all payments made and to be made to the Manager pursuant to the Management Agreement or pursuant to any other management agreement approved by the Tribe and the Project's pro-rata share of Lessee's general and administrative costs and expenses that are not specifically charged to the Project or any other Site, including, without limitation, audit fees, tax return preparation fees and consulting fees. Such pro-rata share may, at Lessee's option and reasonable election, be determined on the basis of the proportion established by the number of pig spaces included in the Project to the number of pig spaces included in all of the Sites.

(f)    "Project" shall mean the pork production facility more fully described on Exhibit  B  attached hereto. The Project may at Lessee's option be developed, constructed and financed in phases consisting of Phase I ("Phase I") and Phase II ("Phase II") as more fully defined and described on Exhibit B  . The decision to proceed or not to proceed to Phase II shall be made by Lessee at its sole option and discretion. The Project shall not include the Personal Property as hereinafter defined.

(g)    "Project Facilities Cost" shall mean all costs, paid or incurred by Lessee prior to the later of final completion of the Project, or the commencement by Lessee of full operation of the Project, in acquiring, developing, designing, constructing, equipping, opening and commencing operations in the Project, including without limitation, all TECRO Fees, financing costs, legal costs, attorneys, engineering, accounting and other professional fees and costs, title insurance costs and loan commitment fees, but excluding all such costs to the extent included in Roads and Service Costs.

(h)    "Roads and Services," and "Roads and Services Costs," "Roads and Services Land" and "Roads and Services Agreements" shall have the meanings stated in paragraphs 4 and 7 of this Lease.

(i)    "Site" or "Sites" shall mean the Project and the following additional sites:

- 2 -

| BIA Tract Number | Legal Description |
|---|---|
| | SE 1/4, Sec 27, T42N, R30W |
| T-63 | E 1/2, Sec 16, T43N, R30W |
| T-929.5 | SW 1/4, Sec 27, T42N, R30W |
| T-1709.5C | NE 1/4, Sec 16, T43N, R31W |
| T-2113.5 | S 1/2, Sec 30, T42N, R31W |
| T-2136.5 | NW 1/4, Sec 24, R43N, R31W |
| T-5841 | NE 1/4, Sec 15, T43N, R31W |
| T-5890 | NW 1/4, Sec 14, T43N, R31W |
| T-5897 | NW 1/4, Sec 23, T43N, R31W |
| T-5901 | SE 1/4, Sec 16, T43N, R31W |
| T-5908 | SE 1/4, Sec 17, T42N, R31W |
| T-5960 | NE 1/4, Sec 24, T42N, R31W |
| T-5969 | SW 1/4, Sec 20, T42N, R30W |
| T-5977 | Lots 3 & 4 and E1/4, SE 1/4, Sec 19, |
| T-5980 | T42N, R30W |
| | NW 1/4, Sec 27, T42N, R30W |
| T-5991 | NW 1/4, Sec 16, T42N, R31W |
| T-11188  11138 | SW 1/4, Sec 23, T43N, R31W |
| T-11233 | N 1/2, Sec 32, T42N, R31W |
| T-11666 | |

Potential Road Access Sites

| | |
|---|---|
| T-3860 | Lots 1 & 2 and E 1/2, NE 1/4, Sec 30, T42N, E30W |
| T-5898 | SW 1/4, Sec 14, T43N, R31W |
| T-5899 | SE 1/4, Sec 14, T43N, R31W |
| Rosebud Sioux Tribe Allotment RS-2053 | Lots 3 & 4 and E1/2, SE 1/4, Sec 30, T42N, R30W |

(a)     Except as noted

Together with all easements and rights appurtenant thereto, if any.

(j)     "TECRO" shall mean the Tribe's Tribal Employment and Contracting Rights Ordinance, Ordinance No. 86-3, as amended.

(k)     The "Tribe's Purchase Option" shall mean the right and option granted to the Tribe to purchase upon expiration of the Term the building, fixtures, improvements and personal property then included in the Project pursuant to paragraph 11 of this Lease.

-3-

2.    TECRO Fees.  In addition to payment of Term Rent, Additional Rent, the costs of development, design and construction of the Project and the other payments to be made and steps to be taken by Lessee as provided in this Lease, Lessee agrees, as further consideration for the execution and delivery of this Lease by the Tribe to pay to the Tribe the following TECRO fees ("TECRO Fees") at the times and in the amounts hereinafter provided:

(a)    A TECRO Fee in the amount of $125,000 to be paid to the Tribe by the Lessee upon commencement of construction of Phase I of the Project.

(b)    A TECRO Fee in the amount of $125,000 to be paid to the Tribe by the Lessee subject to and upon completion of construction of Phase I of the Project.

(c)    A TECRO Fee in the amount of $400,000 to be paid to the Tribe by the Lessee, subject to and upon commencement of construction of Phase II of the Project.

(d)    A TECRO Fee in the amount of $400,000 to be paid to the Tribe by the Lessee, subject to and upon completion of construction of Phase II of the Project.

3.    Premises.

(a)    The Tribe, in consideration of the rents reserved and the terms, conditions, covenants and agreements herein contained, hereby leases to the Lessee, and the Lessee hereby leases and hires from the Tribe, the land located in the County of Mellette, and State of South Dakota, legally described on Exhibit C to this Lease and made a part hereof, and depicted (by approximate location) on the map attached as Exhibit D to this Lease and made a part hereof, together with all rights and easements which apply to and/or benefit the land (including, without limitation all easements and other rights being created or to be created pursuant to this Lease), all improvements now or hereafter constructed thereon, all fixtures now or hereafter constructed or installed thereon, all shared utilities and service agreements, rights, privileges, tenements, licenses, hereditaments, rights-of-way, easements, utility use, appendages and appurtenances appertaining thereto, all betterments, additions, alterations, substitutions, replacements and revisions thereof and thereto, but subject to all rights-of-way, easements, restrictions and encumbrances identified on Exhibit E attached hereto and made a part hereof (the "Permitted Encumbrances"), (collectively, the "Premises").  Lessee shall at all times be the owner of and retain title to all personal property located on the Premises and/or used in connection therewith, including, without limitation, ownership and title to all animals and livestock (collectively the "Personal Property").  Lessee shall have the right from time to time to remove and/or replace any of such Personal Property.  By entering into this Lease, the Lessee accepts the Premises in the condition they are in as of the date of this Lease, as is, without warranty or representation of any kind as to the

condition or quality of the Premises. The Lessee represents that the Premises, the improvements thereon, subsurface conditions, and the present uses and non-uses thereof, have been examined by the Lessee, and the Lessee accepts the same, without recourse to the Tribe except as expressly provided in this Lease, in the condition and state in which they or any of them now are, without representation or warranty, express or implied in fact or by law, as to the nature, condition or usability thereof or as to the use or uses to which the Premises or any part thereof may be put (except as set forth in this Lease) or as to the prospective income from, and expenses of operation of, the Premises. The Tribe warrants that the Project, and the development, design, construction, equipping and operation thereof, as provided in and contemplated by this Lease, constitutes and will continue to constitute permitted, unconditionally licensed and authorized activities on the Premises and a permitted and duly-licensed and unconditionally authorized use of the Premises under the laws of the Tribe.

(b)     The Premises and Project include and are leased together with and subject to the following:

(i)     The nonexclusive right of the Lessee to construct, install, maintain, repair, replace, use and operate, in, on, over and across the Premises and any adjoining lands now or hereafter owned by, or in trust for, the Tribe (collectively, "Adjoining Lands"), such roads as may be required for reasonable access to and from the Premises. The Lessee may construct and maintain at all times during the term of this Lease one or more gravel, paved, unpaved or other roads providing such access (and connecting to publicly dedicated roads) to and from the Premises as may be reasonably required for construction and operation of the Premises and Project for their intended purposes.

(ii)    The nonexclusive right of the Lessee to construct, install, maintain, repair, replace, use and operate, in, on, over and across the Premises and the Adjoining Lands, such electric power, water, phone, and other utilities lines and services serving the Premises and Project as may be required for operation of the Premises and Project for their intended purposes, provided that such utilities lines and services shall be located, designed and constructed in accordance with plans approved in advance by the Tribe, which approval shall not be unreasonably withheld or delayed.

(iii)   A temporary construction easement over and across the Adjoining Lands to construct the Project including, without limitation, the Roads and Services herein defined and described.

- 5 -

(c)    The roads, utilities and services described above in this paragraph are hereinafter collectively referred to as the "Roads and Services." The Roads and Services are included as part of the Premises. The portion of the Tribe's adjoining lands upon which the Roads and Services will be constructed are herein referred to as the "Roads and Services Land." The Roads and Services Land is included in the Premises.

4.    <u>Contingencies</u>.  This Lease is contingent upon the following conditions (collectively the "Contingencies") which must be met and satisfied prior to the commencement of construction of the Project:

(a)    Approval by the Tribe and the Lessee of the locations for and the plans and specifications for the roads, utilities and services to be constructed, installed, maintained, repaired, replaced, used and operated pursuant to paragraphs 3 and 7 of this Lease and any other applicable provisions of this Lease.  Lessee agrees to prepare such plans and to submit the same to the Tribe for approval.

(b)    Lessee's receipt of a commitment for and the closing of financing for the Project from the Permitted Mortgagee, as hereinafter defined or otherwise selected by Lessee, in form and on terms and conditions reasonably satisfactory to the Lessee.

(c)    Approval by the Tribe and the Lessee of all plans and specifications for the Project, including with limitation, all schematic plans, design development plans and specifications and final plans and specifications.  The Tribe's approval of such plans and specifications shall not be unreasonably withheld, delayed or conditioned.

(d)    Receipt of all federal, state, local and tribal governmental, environmental and other approvals, permits, licenses and authorizations required for the lawful development, construction and operation of the Project in form and substance satisfactory to the Tribe, the Lessee and any Permitted Mortgagee.

(e)    The Lessee obtaining satisfactory licenses from landowners in and around Mellette County, South Dakota, permitting the Lessee to enter upon their lands and deposit livestock waste onto such lands and apply such waste as a fertilizer to the lands.

(f)    Approval by the Tribe and Lessee of all agreements with third parties, required for the furnishing of Roads and Services.

- 6 -

(g)    Lessee shall have confirmed to its own satisfaction that the roads, services and utilities required to serve the Project will be available on a timely basis, in sufficient quantities and at acceptable cost and on acceptable terms.

(h)    Receipt by Lessee of a satisfactory title insurance policy establishing conforming ownership and trust status of the Premises and any necessary Adjoining Lands, and receipt by Lessee of a satisfactory survey of the Premises and any necessary Adjoining Lands.

The parties agree that the Project and all plans and specifications to be approved by the parties relating thereto shall be designed to meet all applicable state and federal regulations, or at Lessee's option to exceed such applicable regulations.

5.    Rights Reserved by the Tribe.  In addition to any other rights of the Tribe, the Tribe reserves the following rights with respect to the Premises:

(a)    The nonexclusive right to use and operate, in, on, over and across the Roads and Services Land, the Roads and Services now or hereafter constructed to connect the Project to public right of way, such use to be in common with the Lessee's use, and subject to non-interference with the Lessee's reasonable use for its intended purposes as set forth in this Lease.

(b)    The nonexclusive right to construct, install, maintain, repair, replace, use and operate, in, on, over and across the Roads and Services Land, such electric power, water, sanitary and storm sewer, and other utilities and services serving such other property of the Tribe as the Tribe may reasonably elect in connection with the development of the Tribe's adjoining lands by the Tribe, provided that such utilities and services shall be located, designed and constructed so as to avoid unreasonable interference with the Lessee's use of the Premises and Project for their intended purposes as set forth in this Lease, and provided that the Tribe promptly restores any portion of the Premises disturbed by the construction of such utilities and services.

6.    Setoff.  Lessee shall have the right to set off against Term Rent, Additional Rent or any other charge payable by Lessee to the Tribe pursuant to this Lease, other than the TECRO Fees, any amounts payable to Lessee by the Tribe pursuant to this Lease plus interest accruing on any such amounts from time to time from the date of Lessee's payment or expenditure of such amounts until reimbursement to Lessee by setoff pursuant hereto or otherwise at the annual rate equal to one percent (1%) per annum in excess of the rate of interest from time to time publicly announced by Norwest Bank National Association, or its successors or

-7-

assigns, as its Reference Rate ("Reference Rate"). In the event of any change in the Reference Rate, the rate of interest payable hereunder shall be adjusted annually on each January 1st based on the Reference Rate in effect as of each January 1st. Interest shall be computed on the basis of actual days elapsed and a year of 365 days. Payment of all accrued interest outstanding hereunder shall be due on the 1st day of each calendar month.

7.    Access, Utilities and Services.

(a)    Pursuant to paragraph 3 hereof, the Premises and Project include all land and corridors and right of way required to connect the Project to and to furnish the Project with Roads and Services. Lessee agrees, and Lessee shall have the right within the Roads and Services Land to develop, design, construct and connect said roads, water, electric, telephone and other required access, utilities and services to the Project from the point of public dedication or public availability for such access, utilities and services. Lessee's rights hereunder shall include the right to contract with public or private utility and service providers for the furnishing and maintenance of such access, utilities and services pursuant to agreements (collectively "Roads and Service Agreements") in form and substance satisfactory to Lessee and the Tribe. All costs of developing, designing, constructing and connecting said roads, water, electric, telephone and other required access, utilities and services for the Project, prior to the later of final completion of the Project or the commencement by Lessee of full operation of the Project, including all costs which would have been included in the Project Facilities Costs if such costs had not been excluded as Roads and Service Costs (collectively "Roads and Service Costs"), shall be paid in the first instance by Lessee, provided that the Tribe shall by setoff pursuant to paragraph 6 of this Lease reimburse Lessee for such Roads and Service Costs paid or incurred by Lessee promptly as Lessee's setoff rights accrue and as offsetting funds become available for setoff. All costs paid or incurred by Lessee after the later of final completion of the Project or the commencement by Lessee of full operation of the Project, in maintaining, procuring and/or operating Roads and Services for the Premises and for the Project, and all costs paid or incurred by Lessee after the later of final completion of the Project or the commencement by Lessee of full operation of the Project, as charges for Roads and Services, whether paid to the Tribe, or an affiliate of the Tribe, pursuant to the Roads and Services Agreements, or otherwise, shall be included in Operating Expenses.

(b)    Lessee shall upon completion of the Roads and Services operate such Roads and Services for the benefit of the Project as an Operating Expense, as defined in paragraph 1(e) of this Lease. Thereafter, the Tribe may, at its election and option incorporate the Roads and Services into a roads, utilities and/or service system to be operated by the Tribe for the benefit of the Project and other appropriate users to be selected by the Tribe. If and to the extent that the Tribe assumes such operation, the Tribe shall on a first-priority basis maintain and continue to furnish the Roads and

Services operated or which the Tribe may have undertaken to operate as required for operation of the Project, to Lessee for the benefit of the Project; and Lessee shall reimburse the Tribe for Lessee's pro-rata share of the Tribe's out-of-pocket operating expenses of maintaining and furnishing such Roads and Services based on the proportion of Roads and Services furnished to and consumed by the Project to all Roads and Services furnished by the Tribe to all users of the system operated by the Tribe. Such proportionate usage shall be established to the extent possible by separate meters measuring and recording such usage, unless the parties otherwise agree.

8.    Term of Lease.

(a)    The parties agree that this Lease is a lease "requiring substantial improvements of the land" within the meaning of Section 5(b)(2) of the Corporate Charter of the Rosebud Sioux Tribe, as amended, issued to the Tribe by the Secretary of the Interior under Section 17 of the Indian Reorganization Act of 1934, 25 U.S.C. § 477.

(b)    It is anticipated that this Lease will expire fifteen (15 years after the Commencement Date as hereinafter defined. The term ("Term") of this Lease shall commence on the date ("Commencement Date") upon which the closing of the financing for the Project with the Permitted Mortgagee selected by Lessee to finance the Project is completed and shall expire on the later to occur of (i) payment of the indebtedness") evidenced by the debt instruments to be secured by a leasehold mortgage in favor of such Permitted Mortgagee and all loan and security documents collateral thereto and (ii) fifteen (15 years from the Commencement Date, provided, however that in no event shall the Term exceed twenty-five (25) years from the date hereof. The Commencement Date shall be confirmed by the Lessee and the Tribe in an amendment to this Lease in form satisfactory to the Tribe, the Lessee and any Permitted Mortgagee. If and to the extent that the Gross Revenues are not sufficient to pay all Operating Expenses, as reasonably determined by Lessee, Lessee shall have the right, without the Tribe's joinder, approval and/or consent to amend the Permitted Mortgage(s) and any loan and security documents collateral thereto to extend the amortization and required payments of Indebtedness or indebtedness scheduled therein for such period within the Term and upon such terms and conditions as shall be reasonably necessary and appropriate, as determined by Lessee, to assure that the Gross Revenues will be sufficient to pay and amortize all Operating Expenses, including debt service payments over the extended term of the loan(s) secured by the Permitted Mortgage(s).

9.    Rent and Consideration.

(a)    The construction of the Project by the Lessee, constitutes a public purpose of the Tribe. Pursuant to 25 C.F.R. § 162.5(b)(2), the Tribe has the authority,

- 9 -

with the consent of the Secretary, to lease Tribal land for purposes of subsidization for the benefit of the Tribe.

(b)    In consideration of the possession, use and occupancy of the Premises as set forth herein, the Lessee and its successors and assigns shall pay to the Tribe fixed rent ("Term Rent") of $15.00 for the entire Term of this Lease payable in advance on the first day of the Lease Term and Additional Rent based on Net Profits, as hereinafter provided.

(c)    Within 120 days after the end of Lessee's fiscal year during the Term of this Lease Lessee shall pay the Tribe as Additional Rent for the preceding ~~calendar~~ fisca year, an amount equal to 25% of the Net Profits, as defined in paragraph 1 of this Lease, for the preceding ~~calendar year~~ fisca l

The Lessee further covenants and agrees, as additional consideration furnished by Lessee, to work together with the Tribe to develop and design the Project subject to and in accordance with the provisions of this Lease, to construct the Project or to cause the Project to be constructed, substantially in accordance with the schematic plans and specifications (the "Schematic Plans") identified on Exhibit _F_ attached hereto and made a part hereof, subject to such changes, consistent with the Schematic Plans, as the Tribe and Lessee may approve (which approval shall not be unreasonably withheld, delayed or conditioned), and subject to such further changes as the Tribe and the Lessee may approve. The Lessee also covenants and agrees to seek, place and grant security for the financing ("Financing") of the Project on such terms and conditions acceptable to the Lessee.

10.    TECRO Compliance. Lessee shall at all times comply with TECRO; provided, that to the extent that this Lease specifically addresses matters that are also included in TECRO, the provisions of this Lease shall control. The Tribe shall be entitled to enforce TECRO as currently adopted by the Tribe with any and all of TECRO's current enforcement and compliance provisions.

11.    Tribe's Purchase Option.

(a)    The Tribe shall have and is hereby granted the right, at its option and election, upon expiration of the Term to purchase the Lessee's right, title and interest in the building, fixtures and improvements then included in the Project from Lessee for a purchase price ("Purchase Price") equal to one-half (1/2) of the Project Facilities Cost. The Purchase Price shall be paid in cash at the closing ("Closing") of the sale of said property to the Tribe, and possession of the Project will be delivered to the Tribe at such Closing. Any closing or other transfer or transaction costs or charges payable by reason of such sale, transfer and Closing shall be paid at the Closing 1/2 by the Lessee and 1/2 by the Tribe, except as may otherwise be provided herein. The Management Agreement shall be terminated as part of the

- 10 -

Closing, if the Tribe and the Lessee so elect, or shall continue in full force and effect after the Closing, if the Tribe and the Lessee so elect. Operating Costs for the Project shall be pro-rated as of the date of Closing.

(b)    In the event that the Tribe wishes to exercise the Tribe's Purchase Option as herein granted, the Tribe shall give Lessee written notice of such exercise in the manner provided in paragraph 37 hereof, not later than 180 days prior to the expiration of the Term, and the Tribe must complete the Closing of such purchase prior to the expiration of the Term. If the Tribe does not exercise the Tribe's Purchase Option herein granted, the Lessee shall have the right, at its option and election, during the last 180 days of the Term to remove all or any portion of any Personal Property and any removable property located on the Premises.

(c)    If the Tribe does exercise the Tribe's Purchase Option herein granted, Lessee shall have the right, during the last 180 days of the Term to remove all Personal Property, including, without limitation, livestock and animals, from the Premises and the Project. If the Tribe does not exercise the Tribe's Purchase Option herein granted, Lessee shall have right at its option, at any time during the last 90 days of the Term, to extend the Term for the remaining interval, if any, commencing upon expiration of the Term and terminating on the date which is twenty-five (25) years from the date hereof, by giving the Tribe notice of any such extension in accordance with the provisions of paragraph 37 of this Lease. Any such extension shall be on the same terms and conditions and at the same rent as provided in this Lease for the Initial Term.

12.    Sales Tax. The Tribe agrees, upon and in accordance with Lessee's reasonable request, to cooperate with the Lessee in securing any sales or use tax exemptions which may be available for the benefit of the Tribe, the Lessee and the Project in connection with the purchase of the Project and in connection with the purchase of any property and materials that may be incorporated into the Project.

13.    No Compete and 5-Mile Radius. The Tribe agrees that it will not operate or allow the operation on its tribal, trust or reservation lands or on any other lands owned or controlled by the Tribe of any livestock operation which is competitive to the Project. A livestock operation shall be deemed to be competitive to the Project if it includes facilities or capacity for more than 500 sows, 2,000 slaughtering hogs or 4,000 nursing pigs. The Tribe further agrees that no livestock operation (other than existing livestock operations within the present scope and size of such present livestock operations) shall be operated by the Tribe or allowed to operate by the Tribe on its tribal, trust or reservation land, or on any other lands owned or controlled by the Tribe within a 5-mile radius of the Project.

14.    Hunting. The Tribe agrees that Lessee shall have the right to post no-hunting and no-tresspassing signs and to prohibit hunting on the Premises.

- 11 -

15.    Use of Premises.  The Lessee shall use the Premises solely for the development, design, construction, financing and operation of the Project for agricultural purposes, including, without limitation livestock operations, homes and residences for Project employees, and for all uses related or incidental thereto and for no other purpose unless approved in advance by the Tribe in writing; provided, however, that following any foreclosure of any Permitted Mortgage, as herein defined, on the Lessee's interest in this Lease, or any transfer of such interest in lieu of foreclosure to the holder of any such Permitted Mortgage, the Premises may be used and operated by the holder of the Permitted Mortgage, and/or its successors and assigns, for any lawful purpose.  IN NO EVENT SHALL SUCH PERMITTED MORTGAGEE OR TRANSFEREE OF THE LEASEHOLD ESTATE CREATED BY THIS LEASE CONDUCT GAMING OPERATIONS ON THE PREMISES IN VIOLATION OF THE PROVISIONS OF THE INDIAN GAMING REGULATORY ACT, 25 U.S.C. §§ 2701-2721 (1994).

16.    Permitted Mortgages Only.  The Lessee shall not mortgage, pledge, or encumber the leasehold estate created by this Lease or any portion thereof or interest therein except through a Permitted Mortgage.  For purposes of this Lease, a "Permitted Mortgage" shall be, and a "Permitted Mortgagee" shall be the holder of, (i) that certain Mortgage, Assignment of Leases and Rents, and Security Agreement, dated of even date herewith between the Lessee, as Mortgagor and U.S. Bancorp AG Credit, Inc. ("U.S. Bancorp") as Mortgagee (the "U.S. Bancorp Mortgage"), securing, among other things, the obligations of the Lessee under that certain Loan and Security Agreement of July 1, 1998 herewith among the Lessee and the Mortgagee, executed and delivered in connection with that certain loan, in the original principal amount not to exceed $44,500,000 in favor of U.S. Bancorp; (ii) that certain Mortgage, Assignment of Leases and Rents, and Security Agreement, dated of even date herewith between the Lessee, as Mortgagor and Star Bank, N.A. ( the "Star Bank Mortgage"), securing, among other things, the obligations of the Lessee under that certain Loan and Security Agreement previously executed herewith among the Lessee and the Mortgagee, executed and delivered in connection with that certain loan, in the original principal amount not to exceed _$ 7,100,000_ in favor of Star Bank.

All leasehold interest mortgages must be approved by the Bureau of Indian Affairs Superintendent in accordance with authority delegated by the Area Director under 10 BIAM Aberdeen Area Addendum Release No. 9705.  Any such Permitted Mortgage shall provide that in the event of default in any of the mortgagor's obligations thereunder, the Permitted Mortgagee shall provide written notice to the Tribe and the Bureau of Indian Affairs Agency Office  of such fact and prior to initiation of such proceedings.

- 12 -

Any Permitted Mortgagee shall have, without the requirement of consent by the Tribe, the right, but not the obligation, to enforce and preserve such Permitted Mortgagee's rights under any Permitted Mortgage and any other agreement entered into in connection therewith.

17.    Amendment of Lease.  Any material amendments to this Lease shall be subject to the prior written approval of each Permitted Mortgagee, which approval shall not be unreasonably withheld, delayed or conditioned.  For purposes of this Lease, "material" amendments shall mean any amendment which effects changes in rent, the term of the Lease, a termination of Lease and any other amendments likely to affect adversely the value of the Premises and other collateral under a Permitted Mortgage or the rights and remedies of the Permitted Mortgagee or which would increase the obligations of the Permitted Mortgagee if the Permitted Mortgagee were to foreclose its Permitted Mortgage.  The Lessee and Tribe shall execute such further amendments to this Lease as may be reasonably required by a Permitted Mortgagee or prospective Permitted Mortgagee to carry out the provisions of this Lease.  So long as any Indebtedness or other obligation secured by said Permitted Mortgage shall remain unsatisfied and not fully discharged, the Tribe shall not without the prior written consent of said Permitted Mortgagee being first had and obtained (a) accept any surrender of the Premises or any portion thereof or termination of this Lease, whether voluntary or involuntary or upon a failure of any condition under this Lease, or (b) exercise or accept the exercise of any option or right of the Lessee to terminate this Lease or to purchase the Tribe's reversionary interest hereunder.  The provisions of this paragraph shall not prevent the Tribe from exercising upon the occurrence of an Event of Default, any other rights and remedies provided in this Lease which are not inconsistent with the provisions of the preceding sentence.

18.    Consent to Acquisition of Leasehold Interest by Permitted Mortgagee; Subsequent Assignment and Subletting.  The Tribe and the Secretary (upon approval of this Lease by the Secretary) hereby consent to the assignment and transfer by the Lessee of its interest in this Lease to any Permitted Mortgagee, with encumbrance approval by the Secretary.  If a sale or foreclosure under the approved encumbrance occurs and the encumbrancer or original Permitted Mortgagee is the purchaser, he may assign the leasehold without the approval of the Secretary or the consent of the other parties to the Lease, provided, however, that the assignee accepts and agrees in writing to be bound by all the terms and conditions of the lease. If the purchaser is a party other than the encumbrancer or original Permitted Mortgagee, approval by the Secretary of any assignment will be required, and such purchaser will be bound by the terms of the lease and will assume in writing all the obligations thereunder.

- 13 -

19.   <u>Permitted Mortgagee's Right to Cure Defaults</u>.  Any Permitted Mortgagee shall have the right, but not the obligation, without requirement of consent by the Tribe to:

(a)   cure any default under this Lease within any applicable cure period, and to timely perform any obligation required hereunder, and any such cure or performance by Permitted Mortgagee shall be effective as if the same had been undertaken and performed by the Lessee; and

(b)   acquire and convey, assign, transfer and exercise any right, remedy or privilege granted to the Lessee by this Lease or otherwise by law, subject to the provisions, if any, in said Permitted Mortgage limiting any exercise of any such right, remedy or privilege; and

(c)   rely upon and enforce any provisions of this Lease to the extent that such provisions are for the benefit of a Permitted Mortgagee.

In addition to the rights set forth in the foregoing clauses (a) - (c), in the event of default in any of the Lessee's obligations hereunder, the Tribe shall provide written notice to the Permitted Mortgagee of such fact and the Permitted Mortgagee shall have the right (but not the obligation) within sixty (60) days after its receipt of such notice (or if such default cannot with diligence be cured within such sixty (60) day period, within a reasonable time thereafter provided that the Permitted Mortgagee proceeds promptly to cure the same and thereafter prosecute the curing of such default with diligence), to cure such default in the Lessee's name and on the Lessee's behalf, or otherwise as the Permitted Mortgagee may elect, provided that current payments due the Tribe during such sixty (60) day period (or such lesser time as may have been required to cure such default) are made to the Tribe.

Notwithstanding anything to the contrary contained in this Lease, so long as any indebtedness or other obligation secured by a Permitted Mortgage shall remain unsatisfied and not fully discharged, the Tribe shall not (i) terminate this Lease nor the Lessee's right of possession of the Premises; (ii) exercise any right of reentry provided in this Lease or otherwise by law; (iii) take possession of and/or relet the Premises or any portion thereof; or (iv) enforce any other right or remedy which may affect the rights of any Permitted Mortgagee under the applicable Permitted Mortgage; provided, however, that upon expiration of the term of this Lease, the Tribe shall have the right to reenter and take possession of the Premises.

A Permitted Mortgagee shall not be required to assume personal liability for the payment and performance of the obligations of the Lessee hereunder.  Any such payment or performance or other act by a Permitted Mortgagee hereunder shall not be construed as an agreement by such Permitted Mortgagee to assume such personal liability; provided, however, that in the event the Permitted Mortgagee transfers the

leasehold estate to a purchaser of the same any such transferee shall be required to enter into a written agreement assuming such personal liability. Notwithstanding anything to the contrary contained in this Lease, following foreclosure by any Permitted Mortgagee on the Lessee's interest in this Lease, or any transfer of such interest in lieu of foreclosure, the Permitted Mortgagee shall have no affirmative obligation hereunder except to pay the Term Rent and any Additional Rent.

20.    Assignments and Subletting. Except as otherwise provided in this Lease, and subject to any restrictions of the Lessee in a Permitted Mortgage, the Lessee shall not assign, pledge, encumber, hypothecate or transfer all or any part of the Lessee's interest in this Lease, whether voluntarily or involuntarily, by operation of law or otherwise, and shall not sublease all or any portion of the Premises, without the prior approval of the Secretary and without the prior written consent of the Tribe and any Permitted Mortgagee, which consent shall not be unreasonably withheld, delayed or conditioned.

21.    Compliance with Law. The Lessee shall not use or cause or permit to be used any part of the Premises for any conduct or purpose which violates any applicable law, regulation, code or ordinance, or any order of any court or governmental authority having jurisdiction over the Premises.

All applicable Tribal licensing, permitting, and other approval requirements (including, but not limited to building codes and permits) that must be adhered to by the Lessee under tribal law in order for the Lessee to utilize the Premises for the purposes set forth in this Lease are identified in Exhibit G hereto. The Tribe shall not impose any additional requirements on the Project, the Premises or the Lessee's use thereof other than reasonable, nondiscriminatory requirements that apply to the conduct of business within the Rosebud Reservation generally and do not materially and adversely affect the Lessee's use of the Premises for the purposes set forth in this Lease.

22.    Hazardous Substances. The Lessee covenants and hereby agrees that the Lessee shall not, during the term of this Lease, permit toxic or hazardous substances or wastes, pollutants or contaminants, including, without limitation, asbestos, urea formaldehyde, the group of organic compounds known as polychlorinated biphenyls, petroleum products including gasoline, fuel oil, crude oil and various constituents of such products, any hazardous substance as defined in the Comprehensive Environmental Response, Compensation and Liability Act 42 U.S.C. §§ 9601 et. seq., and any other substance similarly defined or identified in any other federal, state or tribal laws, rules or regulations relating to the protection of the environment (collectively, "Hazardous Substances"), to be generated, treated, stored, transferred from, discharged, released or disposed of, or otherwise placed, deposited in or located on, used, transported over, or otherwise entered on or into the Premises, except in accordance with all applicable state, federal, local and tribal laws,

- 15 -

regulations, rules, codes and ordinances relating to the protection of the environment ("Environmental Laws"); nor shall the Lessee undertake any activity on the Premises that would cause or contribute to the Premises becoming a treatment, storage or disposal facility for Hazardous Substances within the meaning of any applicable Environmental Laws. The foregoing provision shall not be deemed to prohibit the incidental storage or use of Hazardous Substances in the ordinary course of the Lessee's business, or operations within the scope of the operating requirements of the Project, provided such storage, use and/or operation is in compliance with all applicable Environmental Laws.

23.   Exculpation.  The United States, and its officers, agents or employees shall not be liable to the Lessee or its successors, assignees or subtenants, including any Permitted Mortgagee, for any loss, damage, or injury of any kind whatsoever to the person or property of the Lessee or any sublessee, or any other person, caused by any use or condition of the Premises or by any defect in any structure erected thereon, or arising from any accident, fire or other casualty on the Premises.

24.   Indemnification of Tribe.  The Tribe shall not be liable for, and the Lessee shall defend, indemnify and hold the Tribe, its officers, agents and employees, harmless against all liability, claims of liability, obligations, suits, damages, penalties, claims, costs, charges, and expenses, including attorney's fees, that may be imposed upon the Tribe by reason of:

(a)     Any work or things done in, on or about the Premises and/or Project, or any part thereof, unless such work is performed by the Tribe or its agent, agency or independent contractor or an agent or independent contractor of an agency of the Tribe;

(b)     Any use, possession, occupation, condition, operation, or maintenance of the Premises and/or the Improvements by the Lessee or its agents, employees, contractors or invitees;

(c)     Any negligence on the part of the Lessee or any of the Lessee's agents, contractors, servants, employees, subtenants, licensees, or invitees; or

(d)     Any failure by the Lessee to perform or comply with any of the covenants, agreements, terms or conditions contained in this Lease on its part to be performed or complied with.

The Lessee's obligation to defend the Tribe hereunder shall be by counsel reasonably acceptable to the Tribe, and "attorney's fees" shall include both reasonable attorneys' fees and paralegals' fees and expenses. In the event that any action or proceeding is brought against the Tribe, its members, officers, agents or employees by reason of any of the matters set forth in clauses (a) through (d) above,

-16-

then the Lessee, upon notice from the Tribe, shall protect and defend at the Lessee's sole expense such action or proceeding, and in the event the Lessee shall fail to protect and defend the Tribe, its members, officers, agents or employees, then the Tribe may undertake to protect and defend itself, its members, officers, agents or employees and the Lessee shall pay to the Tribe, upon demand, all costs and expenses incurred by the Tribe in connection therewith, including, without limitation, all attorneys' fees and expenses. The provisions of this paragraph 24 are for the sole benefit of the Tribe, and may not be relied on or enforced by any other party. The obligations of the Lessee under this paragraph 24 (i) shall be personal to the Lessee and independent of the demise of the Premises, (ii) shall not run with the land or the leasehold estate hereunder, (iii) need not be assumed by any person or entity who succeeds to the Lessee's interest hereunder (including without limitation any Permitted Mortgagee or any purchaser upon foreclosure of any Permitted Mortgage), (iv) shall not, if unpaid, be collectible from any property subject to a Permitted Mortgage, or any proceeds thereof, or from any Permitted Mortgagee or its successors or assigns, and (v) shall not, if unpaid, constitute a default under this Lease or grounds for termination of this Lease.

25.  Payment of Taxes and Other Expenses.

(a)  Except as herein expressly provided to the contrary, the Lessee shall pay all costs of owning, operating, constructing, maintaining, repairing, replacing and insuring the Premises and any improvements located thereon, and subject to the provisions of paragraph 7 hereof, all charges for water, sewer and other utilities, services furnished to the Premises. The Tribe has advised the Lessee that the development, design, construction and operation of the Premises will be free of any governmental fees or charges, sales or use taxes, real estate taxes, assessments or similar charges or charges in lieu thereof. Accordingly, all fees, taxes, assessments and other governmental charges or charges in lieu thereof which may be levied against the Premises or the Lessee's interest in the Premises by the Tribe or any other governmental authority having the power to levy such fees, taxes, assessments or other charges, and which are payable for and with respect to the term of the Lease, shall be paid and absorbed when due by the Tribe without reimbursement from the Lessee, and Lessee shall have no payment or other obligation with respect thereto.

(b)  The Tribe represents that there are no tribal taxes, fees, assessments or other charges payable to the Tribe for or in connection with the Project or the Premises or levied against the Premises that are required for use of the Premises for the purposes set forth in this Lease except as set forth in paragraphs 2 and 10 of this Lease and identified in Exhibit H as TECRO Plan as modified and Land Lease Use Tax. The Tribe shall not impose any new or additional taxes, fees, assessments or other charges on the Premises or the Lessee, except for reasonable, nondiscriminatory charges for utilities or other services, if supplied by the Tribe subject to and in accordance with the provisions of paragraph 7 of this Lease.

- 17 -

(c)    In the event that the State of South Dakota, or any subdivision, department or agency organized under the laws of the State of South Dakota, assesses any tax, fee or assessment against the Project, or the construction thereof, such tax, fee or assessment, to the extent actually paid, shall be a Project Facilities Cost.  This provision shall not be construed to imply that the Tribe or the Lessee concede that the State of South Dakota, or any such subdivision, department or agency, has the power to assess any tax, fee or assessment against the Project or the construction thereof, and the Tribe and the Lessee shall cooperate in the contest and opposition against any such assessment.

(d)    Nothing contained in this Lease is intended or shall be construed to constitute a waiver by the Tribe or the Lessee of any applicable laws that provide tax immunity to trust or restricted Tribal property or to any interest therein or income derived therefrom.

26.    Lessee's Repair Obligations; Insurance.  The Lessee will, at its expense, maintain, repair and replace, whether as a result of casualty, or otherwise, the Premises and all improvements now located or hereafter constructed thereon, (other than any improvements (the "Excluded Utilities") which are part of any utilities and services to be operated by the Tribe pursuant to paragraph 7(b) of this Lease) pursuant to the terms of this Lease in order that the same is in good, safe and habitable condition throughout the term of this Lease, ordinary wear and tear excepted.  The Lessee shall maintain or cause the manager of the operations at the Premises to maintain adequate "all-risk" property insurance in an amount equal to the full replacement value of all buildings and other improvements and fixtures located on the Premises, other than the Excluded Utilities, against loss throughout the term of this Lease.  The Lessee shall maintain such additional insurance with respect to the Project as the Lessee may elect to maintain or as may be required by any Permitted Mortgagee.  In addition, the Lessee shall maintain or cause the manager of the operations at the Premises to maintain comprehensive general liability insurance against claim for bodily injury, death or property damage occurring in, on or about the Premises with a combined single limit of at least $2,000,000 per occurrence, together with an umbrella policy of liability insurance providing additional coverage of at least $5,000,000 per occurrence.  All such policies of insurance shall name the Tribe and any Permitted Mortgagee as additional insureds and loss payees, as appropriate, shall provide for 30 days' advance written notice to the Tribe and any such Permitted Mortgagee prior to any modification or cancellation thereof, and shall be in form and substance, and issued by insurance companies, reasonably satisfactory to the Tribe, Lessee and such Permitted Mortgagee.  Subject to the terms of any Permitted Mortgage, any insurance proceeds received as a result of damage or destruction shall be applied first to the cost of restoration of any Improvements covered by such insurance and located on the Premises, and the remainder, if any, shall be paid to the Lessee or to any Permitted

- 18 -

Mortgagee, to the extent required by such Permitted Mortgage. The Lessee shall provide the Tribe and each Permitted Mortgagee with a duplicate original of each of the Lessee's insurance policies and renewals thereof prior to commencement of the Lease term and prior to expiration of any existing policy.

27.    _Improvements and Alterations_. Lessee shall have and is hereby granted the right to enter the Premises, including, without limitation the Roads and Services Land, to construct the Project, including without limitation the Roads and Services. No other building or improvement shall be constructed or materially altered by the Lessee, and no grading, excavating or other construction activity shall be commenced, on the Premises unless complete and final plans and specifications for such construction or alteration have been submitted to and approved by the Tribe and any Permitted Mortgagee. Any such approval of the Tribe shall not be unreasonably withheld or delayed. Any such construction or alteration shall be commenced and completed promptly and in a good and workmanlike manner and in compliance with all applicable permits, authorizations and building, zoning and other laws and ordinances and the requirements of all Permitted Mortgagees.

28.    _Surrender of Possession; Ownership of Improvements_. The Lessee agrees peaceably to surrender possession and occupancy of the Premises to the Tribe at the termination or expiration of the Term of this Lease. Any and all buildings, improvements, fixtures and related facilities now existing or hereafter constructed on the Premises, including utilities constructed or installed in or on the Premises by or at the expense of the Tribe, and all repairs, remodeling or additions thereof or thereto (collectively, the "Improvements") shall, subject to the provisions of paragraph 7, at all times, be a part of the Premises leased to the Lessee pursuant to this Lease, and all references in this Lease to "Premises" shall include such improvements.

29.    _Default_. The occurrence of any of the following events shall constitute an Event of Default by the Lessee under this Lease:

(a)    the Lessee fails to pay when due any amount required to be paid by the Lessee under this Lease and such failure continues for 30 days after written notice thereof from the Tribe to the Lessee and any Permitted Mortgagee; or

(b)    the Lessee fails to observe or perform any other covenant or obligation of the Lessee under this Lease and such failure continues for 60 days (or, if such default cannot reasonably be cured within 60 days, for such longer period reasonably required to cure such default provided that the Lessee has within such 60 days promptly commenced curing such default and diligently pursues such cure to completion) after written notice from the Tribe to the Lessee and any Permitted Mortgagee.

- 19 -

Notwithstanding the foregoing, if the Lessee, in connection with a good faith dispute, deposits funds in escrow or obtains a bond that prevents any foreclosure of the leasehold estate, then the Lessee shall not be in default hereunder.

30.    <u>Dispute Resolution and Consent to Suit</u>.

(a)    <u>Waiver of Sovereign Immunity</u>.  Subject to the further provisions of this paragraph 30 and paragraph 31, the Tribe hereby expressly waives its sovereign immunity (and any and all defenses based thereon) from any suit, action or proceeding and from any legal process (whether through service of notice, attachment, execution, exercise of contempt powers or otherwise) with respect to any action against the Tribe, or any affiliate, agent or agency of the Tribe, seeking to enforce this Lease or to exercise any remedy herein provided.  The Tribe may not revoke this waiver of sovereign immunity so long as any of its obligations remain outstanding hereunder.

(b)    <u>Jurisdiction</u>.  The Tribe and the Lessee hereby unconditionally agree that any suit, action or proceeding with respect to this Lease and the rights and obligations of the parties arising herefrom or related hereto, or any action or proceeding to execute or otherwise enforce any judgment in respect of any breach hereof, brought by either of them or any Permitted Mortgagee against either of them or any Permitted Mortgagee, shall be brought by such party in either the United Stated District Court for the District of South Dakota, Central Division, or the Tribal Court of the Rosebud Sioux Tribe.  By the execution and delivery of this Lease, the Tribe and the Lessee, as well as any Permitted Mortgagee, consent to and submit to the personal jurisdiction and venue of each such court.

(c)    <u>Service of Process</u>.  The Tribe hereby appoints Norman G. Wilson to receive service of process on its behalf; the Lessee hereby appoints Richard Bell to receive service of process on its behalf.  Any Permitted Mortgagee shall, at the time of the execution and delivery of any Permitted Mortgage as allowed by this Lease, appoint and identify the individual to receive service of process on its behalf.  The parties further agree that process served upon the above individuals shall, to the extent permitted by law, constitute adequate service of process in any such suit.  Either party, and any Permitted Mortgagee, shall be allowed to substitute and appoint any other person, reasonably acceptable to the other party and any Permitted Mortgagee, to replace such agent for service of process.  Any such substitution and

- 20 -

appointment shall require that such agent agree, in writing, to serve in that capacity.

(d)  Limitation of Liability.  Notwithstanding any provision of this Lease to the contrary, the obligations of the Tribe and the Lessee hereunder are expressly limited to their respective interest in the Premises and to revenues received and to be received by the Tribe and the Lessee from the Project.  All claims of either party to punitive damages against the other party under any circumstance are hereby expressly waived.

(e)  Jurisdiction of Tribal Courts.  The courts of the Tribe shall retain nonexclusive jurisdiction to (i) enforce this Lease; (ii) enforce any judgment obtained in federal court by either party or any Permitted Mortgagee against the other party of any Permitted Mortgagee, without substantive review of such judgment or the basis therefore; and (iii) enforce any award obtained in arbitration against the other party or any Permitted Mortgagee, without substantive review of such award or the basis therefor.

(f)  Arbitration.  At the option of any party, from time to time, any controversy or claim between or among the parties and any Permitted Mortgagee arising out of or relating to this Lease and any claim based on or arising from an alleged tort, may be determined by arbitration. Arbitration shall be conducted in accordance with the United States Arbitration Act (Title 9, U.S. Code), notwithstanding any choice of law provision in this Lease, and under the Commercial Rules of the American Arbitration Association ("AAA").  The arbitrators shall give effect to statutes of limitation in determining any claim.  Any controversy concerning whether an issue is arbitrable shall be determined by the arbitrators.  Judgment upon the arbitration award may be entered in any court having jurisdiction as hereinabove provided.  The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration.

(g)  Provisional Remedies, Self-Help and Foreclosure.  No provision of this section shall limit the right of either party or any Permitted Mortgagee to exercise self-help remedies such as setoff, to foreclose against or sell any immovable or movable property, collateral or security or to obtain provisional or ancillary remedies from a court of competent jurisdiction to the extent permitted by tribal law before, after, or during the pendency of any arbitration or other proceeding, and the exercise of

- 21 -

a remedy does not waive the right of any party or Permitted Mortgagee to resort to arbitration.

(h)  Waiver.  The Tribe and the Lessee hereby (i) unconditionally waive, to the fullest extent permitted by law, trial by jury in any legal action or proceeding relating to this Lease and for any counterclaim therein, (ii) certify that no party hereto nor any representative or agent of counsel for any party hereto has represented, expressly or otherwise, or implied that such party would not, in the event of litigation, seek to enforce the foregoing waivers, and (iii) acknowledge that any Permitted Mortgagee has been induced to accept its mortgage by, among other  things, the mutual waivers and certifications contained in this  provision.

31.  Performance During Disputes.  It is mutually agreed that during any kind of controversy, claim, disagreement or dispute, including a dispute as to the validity of this Lease, the Lessee shall remain in possession of the Premises as tenant and the Tribe and the Lessee shall continue their performance of the provisions of this Lease. The Lessee shall be entitled to injunctive relief from a court described in paragraph 30(b) of this Lease to maintain possession in the event of a threatened eviction during any dispute, controversy, claim or disagreement arising out of this Lease.

32.  Termination.  Upon the occurrence of an Event of Default by the Lessee and expiration of any applicable notice and cure period, the Tribe shall have the right to terminate this Lease with the consent of the Secretary, pursuant to 25 C.F.R. § 162.14 (as that regulation may be amended), subject to the rights of any transferee permitted hereunder or any Permitted Mortgagee, as provided in this Lease, and subject to the right of the Lessee during the 180 day period following the effective date of any such termination to remove all or any portion of the Personal Property.

33.  Obligations of Lessee.  While the leased premises are in trust or restricted status, all of the Lessee's obligations under this Lease and the obligations of any successor of Lessee under this Lease are to the United States of America as well as to the Rosebud Sioux Tribe.  25 C.F.R. § 162.5(g)(1).

34.  Federal Supervision.  The Lessee acknowledges and understands that title to the premises is held by the United States of America in trust for the Tribe.  Nothing contained in this Lease shall operate to delay or prevent a termination of Federal trust responsibilities with respect to the Premises by the issuance of a fee patent or otherwise during the term of this Lease; however, such termination shall

-22-

not serve to abrogate this Lease. No member of, or delegate to, Congress or Resident Commissioner shall be admitted to any share or part of this Lease or to any benefit that may arise hereunder, but this provision shall not be construed to extend to this contract if made with a corporation or company for its general benefit. During any period when the Premises are in trust or restricted status, all of the Lessee's obligations under this Lease, and the obligations of its sureties, are to the United States as well as to the Tribe.

35.    Successors Bound. The terms of this Lease shall benefit and be binding upon the successors and assigns of the Tribe and the successors and permitted assigns of the Lessee in like manner as upon the original parties, except as otherwise provided in this Lease. The term "Lessee," as used in this Lease, means the Lessee and any person or entity succeeding to the interest of Lessee as tenant under this Lease, in accordance with the provisions of this Lease and applicable law.

36.    Quiet Enjoyment. The Tribe covenants that at all times during the term of this Lease, so long as no uncured Event of Default has occurred and is continuing hereunder, the Lessee's quiet enjoyment of the Premises or any part thereof shall not be disturbed by any act of the Tribe or anyone acting by, through or under the Tribe.

37.    Notices. Any notice required by or sent pursuant to any provision of this Lease shall be in writing and shall be deemed given if and when it is personally delivered or sent by certified mail addressed, until some other address is designated in a notice so given, as follows:

If to Tribe:                       Norman G. Wilson
                                   President
                                   Rosebud Sioux Tribe
                                   11 Legion Avenue
                                   Rosebud, South Dakota  57570


With copies to:                    Terry L. Pechota
                                   Viken, Viken, Pechota,
                                       Leach & Dewell, LLP
                                   1617 Sheridan Lake Road
                                   Rapid City, South Dakota  57702


If to Lessee:                      Sun Prairie
                                   509 Dakota Avenue
                                   Wahpeton, North Dakota  58075

- 23 -

Attention: Richard Bell

With copies to:

Russell F. Freeman, Esq.
Nilles, Hansen & Davies, Ltd.
1800 Radisson Tower
201 North Fifth Street
P.O. Box 2626
Fargo, North Dakota 58108

With copies to:

Thomas R. Manthey, Esq.
Dorsey & Whitney LLP
Pillsbury Center South
220 South Sixth Street
Minneapolis, Minnesota 55402

Any notice required by or sent pursuant to any provision of this Lease shall also be sent to any Permitted Mortgagee.

38.    <u>Governing Law</u>. This Lease shall be construed for all purposes in accordance with and governed by the laws of the Tribe, provided however that any change in the laws of the Tribe occurring after the adoption of the Resolution by the Tribal Council shall not constitute a part of the law governing this Lease if such change will have an adverse effect on the rights of any party hereto or any Permitted Mortgagee or if such change is intended to or will have the effect of limiting, restricting or adversely effecting the enforceability of this Lease in accordance with its terms, conditions and provisions.

39.    <u>Recording</u>. Following approval by the Secretary, this Lease, or a memorandum of this Lease in the form prescribed by South Dakota law, shall be recorded in the appropriate Land Titles and Records Office of the Bureau of Indian Affairs, in the appropriate land records of the County of Mellette, South Dakota and any land records of the Tribe.

40.    <u>Invalid Provisions</u>. If any clause, section, article, paragraph, or subparagraph of this Lease shall be unenforceable or invalid, such material shall be read out of this Lease and shall not affect the validity of any other clause, section, article, paragraph, or subparagraph, or give rise to any cause of action of either party to this Lease against the other, and the remainder of this Lease shall be valid and enforceable to the fullest extent permitted by law.

41.    <u>Waiver</u>. The waiver by the Tribe, the Lessee or any Permitted Mortgagee of, or the failure of the Tribe, Lessee or any Permitted Mortgagee to take action with respect to, any breach of any term, covenant, condition, provision,

- 24 -

restriction, or reservation herein contained, shall not be deemed to be a waiver of such term, covenant, condition, provision, restriction, or reservation or subsequent breach of same, or of any other term, covenant, condition, provision, restriction, or reservation herein contained. The Tribe and/or the Lessee may grant a waiver of any term of this Lease, but such must be in writing and signed by the Tribe or Lessee, as the case may be, before being effective.

42.    Saving Clause.  If for any reason the term of this Lease, or any renewal thereof, or any substantive provision thereof, shall be found to be unenforceable, illegal or violative of public policy, this Lease shall automatically be amended to conform to the applicable decision, and each party hereto expressly agrees to execute any amendment necessary to effectuate the goals and purposes of this Lease.

43.    Force Majeure.  If any dispute shall arise under any provision of this Lease as to whether the Lessee shall have commenced promptly or within any limit of time specified in this Lease or proceeded continuously and with diligence with any required construction, repair, replacement or other performance, there shall be a suspension of required performance during the period of delay caused by any acts of God or by strikes which affect the building industry generally or the Premises specifically or by orders, directives or regulations of any governmental agency or board, the unavailability of the materials reasonably required for any such construction, repair, replacement or performance, any delays in adjusting any insurance loss, and any other delays caused by causes beyond the reasonable control of Lessee.  The provisions of this paragraph 43 shall not, however, apply to a default by the Lessee in the payment of any Term Rent, Additional Rent or TECRO Fees to be paid by the Lessee under the provisions of this Lease.

44.    Estoppel Certificate.  The Tribe and the Lessee, promptly upon any request therefor from the other or by a Permitted Mortgagee, shall execute, cause such signature to be acknowledged by a notary public and deliver to the other or to a third person, if so directed by the other, a statement in writing identifying this Lease and the parties hereto and declaring, as of the date thereof, the following and such other matters as may be reasonably required by the party making such request:

(a)    Whether or not this Lease is in default, and, to the extent that any default does then exist, the nature of any such default, including any event which may constitute an Event of Default upon the mere passage of time or notice or both;

(b)    Whether or not this Lease is in full force and effect and that this Lease has not been modified except as provided in an amendment or amendments identified therein, stating further that this Lease as so amended is in full force and effect;

- 25 -

(c)    The date to which the rent and other charges required to be paid under this Lease have been paid by or on behalf of the Lessee;

(d)    That the Tribe has not conveyed, assigned, transferred or delegated any right or duty of the Tribe hereunder, nor has the Tribe encumbered or otherwise hypothecated the Tribe's reversionary interest in and to the Premises or any rights hereunder except as may be set forth in such statement; and

(e)    That any such statement may conclusively be relied upon by the Tribe, the Lessee and any Permitted Mortgagee or any proposed Permitted Mortgagee in making a loan to the Lessee or by any title insurance company which issues a title insurance policy or other guaranty or endorsement relating to the existence and status of this Lease.

45.    <u>No Merger</u>.  So long as any Permitted Mortgage is in existence, unless Lessee and all Permitted Mortgagees shall otherwise expressly consent in writing, the fee title to the Premises and the leasehold estate created by this Lease shall not merge with any other estate.

46.    <u>Third Party Beneficiaries</u>.  This Lease is intended to benefit any Permitted Mortgagee including, without limitation, U.S. Bancorp, whose acceptance hereof is waived.

47.    <u>Compliance with 25 U.S.C. §81</u>.  In compliance with 25 U.S.C. §81 the residence and occupation of the parties is stated as follows:

|  |  |
|---|---|
| Party in interest: | Rosebud Sioux Tribe |
| Residence: | P.O. Box 430<br>Rosebud, SD 57570 |
| Occupation: | A federally recognized Indian Tribe |
| Party in interest: | Sun Prairie, a Nebraska General Partnership |
| Residence: | 509 Dakota Avenue<br>Wahpeton, North Dakota  58075 |
| Occupation: | Operation of pork production facilities |
| Scope of Authority: | The Tribe is authorized to execute the within document by a resolution adopted by the Tribal Council of the Tribe at a meeting at Rosebud, |

- 26 -

South Dakota, on August 19, 1998. The Tribal Council exercises its authority in this instance because it believes the acquisition and operation of the Project to be in accordance with the long-range economic objectives of the Tribe.

48. _Trust Land_. The Tribe represents that the Premises are Indian Trust Land and are therefore not subject to taxation by any County Government or the regulatory authority of any department of the State of South Dakota.

49. _South Dakota Law_. To the extent any South Dakota agencies or County should claim regulatory, licensing or taxing authority over the Premises, the parties agree to renegotiate and adjust the terms of this Lease as appropriate to adjust for such regulatory, licensing or taxing authority or claim.

50. _Relationship of Parties_. It is understood and agreed that the relationship of the parties hereto is strictly that of lessor and lessee and that this Lease shall not be construed as a joint venture or partnership. Lessee is not and shall not be deemed to be an agent or representative of the Tribe.

51. _Guaranty_. The obligations of the Lessee to the Tribe under this Lease shall be personally guaranteed by Mr. Richard Bell, general partner in the Lessee, pursuant to a separate Guaranty Agreement ("Guaranty"); provided, that:

(a) the obligations of Mr. Bell under the Guaranty shall be subject to the same limitations on liability as apply to the Tribe and the Lessee under paragraph 30(d) of this Lease;

(b) the benefit of such Guaranty shall run solely to the Tribe and may not be assigned by the Tribe;

(c) any claim against the Lessee under this Lease which is also guaranteed under the Guaranty shall first be asserted against the Lessee and judgment satisfied out of the assets of the Lessee (subject to the limitations on liability thereof under paragraph 30(d) of this Lease), with recourse by the Tribe under the Guaranty being limited to an action to recover any amount remaining unsatisfied on such judgment after exhaustion of action against the Lessee; and

(d) all obligations of Mr. Bell under the Guaranty shall terminate upon his death and shall not be an obligation of his heirs.

52. _Required Reclamation Plan_. The Required Reclamation Plan shall mean the Bureau of Indian Affairs Reclamation Plan more fully defined and

- 27 -

attached hereto and made a part hereof as Exhibit I. In the event that the Lease is terminated by reason of abandonment of the Premises by Lessee or any successor of Lessee, Lessee shall be responsible for such reclamation. Lessee will have no other responsibilities for reclamation.

IN WITNESS THEREOF, this Lease has been executed as of the date first above written.

WITNESSES:

ROSEBUD SIOUX TRIBE

By: _____

Title: _____President_____

SUN PRAIRIE, A NEBRASKA
GENERAL PARTNERSHIP

By: _____

Title: _____General Partner_____

- 28 -

STATE OF SOUTH DAKOTA ))) ss.

COUNTY OF  PENNINGTON

On  9/8  , 1998,  NORMAN G. WILSON  , personally appeared before me, signer and sealer of the foregoing instrument, who acknowledged that he executed the instrument as the President of the ROSEBUD SIOUX TRIBE, a federally recognized Indian tribe, as his free act and deed and the free act and deed of the Tribe.

Notary Public
My Commission Expires:  6-5-2003
Kenneth R. Dewell

Seal

STATE OF SOUTH DAKOTA ))) ss

COUNTY OF  PENNINGTON

On  9/8  , 1998,  RICH BELL  , personally appeared before me, signer and sealer of the foregoing instrument, who acknowledged that he or she executed the instrument as the General Partner  of SUN PRAIRIE, a Nebraska General Partnership, as his/her free act and deed and the free act and deed of the General Partnership.

Notary Public
My Commission Expires:  6-5-2003
Kenneth R. Dewell

Seal

- 29 -

345 54214

Approved Pursuant to 25 U.S.C. §§ 81
and 415 and 25 C.F.R. § 162.5:

United States Department of the
Interior, Bureau of Indian Affairs:

By: _Cora L Cops_

Date: _16 Sept 98_

Area Director of the Aberdeen Area
Office of the Bureau of Indian Affairs
for the Secretary of the Interior and the
Commissioner of Indian Affairs,
acting under delegated authority

RECORDED
B.I.A. - LTRO

STATE OF _So Dak_ )
                            ) ss.
_County_ OF _Todd_ )

On _Sept 16_, 1998, personally appeared before me, _Harold W._
_____ _Compton_ a Notary Public in and for said _County_ and
State, _Cora L. Jones_, personally known to me to be the
person whose name is subscribed to the above instrument, who acknowledged that
he or she executed the instrument as the Area Director of the Aberdeen Area Office
of the Bureau of Indian Affairs, for the Secretary of the Interior and the
Commissioner of Indian Affairs, acting under delegated authority.

_Harold W Compton_

Notary Public
My Commission

Expires: _Apr 122 2001_



-30-

EXHIBIT A

# MANAGEMENT AGREEMENT

THIS MANAGEMENT AGREEMENT ("Agreement") is entered into effective as of the 1ˢᵗ day of May, 1997, by and between **SUN PRAIRIE, A PARTNERSHIP**, A Nebraska General Partnership (the "Owner") and **BELL FARMS LLP**, a North Dakota Limited Liability Partnership ("Bell").

### Preamble

By this Agreement the Owner is engaging Bell to provide management services relating to the operation of Owner's nursery and finishing facilities (the "Facilities") for the production of feeder pigs and market hogs which will be sold to Hormel Foods Corp. through long-term slaughter hog agreements.

### I.   General Assumptions

1.1    **General Responsibility of Bell**.  During the term of this Agreement, Bell assumes responsibility to implement the policies, budget and goals for the Facilities established by the Owner and, within the annual approved budget, to: supervise the day-to-day operations of the Facilities; employ the personnel to operate the Facilities, select and purchase equipment, purchase feed and supplies; maintain and provide the Owner with production record keeping and Facilities accounting information; and, make recommendations as to future budgets and operations of the Facilities.  These services are more particularly described in Article II.

1.2    **General Responsibility of Owner**.  During the term of this Agreement, the Owner retains responsibility to establish and periodically review and change as necessary the policies, budget, and short-range and long-range goals of the Facilities. The Owner retains the right to review and evaluate the performance of Bell in carrying out the policies and in attaining the budget and the goals established by the Owner. These responsibilities are more particularly described in Article III.

### II.   Specific Responsibilities of Bell

2.1    **Management**.  Bell shall:

2.1.1    Recommend policies and goals to be established by the Owner, and regularly evaluate policies and goals;

2.1.2    Select and arrange the layout of buildings, equipment, feed and watering systems, capital items and replacements, and all other systems needed to operate the Facilities.

2.1.3    Supervise the day-to-day operations of the Facilities, subject to and in

-2-

accordance with the budgets and policies established from time to time by the Owner; and

2.1.4   Develop, install, and maintain specific operating procedures, systems and controls.

2.2   <u>Personnel</u>. Bell shall:

2.2.1   Hire, supervise, and compensate as employees of Bell for the Facilities, all employees as needed, and their replacements.   Although the employees shall be employees of Bell, the total compensation and fringe benefits shall be reimbursed to Bell by the Owner.   Compensation includes salary and performance incentives.   Fringe benefits include: (i) all accruing payroll taxes including FICA taxes and state and federal unemployment contributions, (ii) all insurance premiums which are based on payroll, including workers' compensation and employer's contribution to group life, medical insurance and retirement plans, and (iii) vacations.   Bell retains the right to transfer personnel so long as the agreed service functions remain fulfilled.

2.2.2   Establish personnel policies, procedures, and forms and identify resources to be made available;

2.2.3   Recommend appropriate employee compensation and benefit plans that are competitive within the industry and the locale, for approval by Owner;

2.2.4   Recommend employee performance appraisal and goal setting programs; and

2.2.5   Supervise Facilities management with on-site visits by appropriate Bell home office executives and staff.

2.3   <u>Operations</u>. Bell shall:

2.3.1   Recommend the general type, amount, and layout of equipment to be purchased for the Facilities;

2.3.2   Select and purchase for Owner equipment of the general character and cost approved by the Owner and maintain the buildings and equipment in good condition, subject to normal wear and use;

2.3.3   Select and purchase for Owner high quality feeds and products and other supplies of the general character and amount approved by the Owner provided the quality and price thereof are competitive with others available;

2.3.4   Contract or provide veterinarian services for Owner as needed;

2.3.5   Maintain and operate all the resources necessary to house, feed, rear, and care for the nursery and finisher pigs (the "Stock") in strict accordance with generally accepted practices and principles of good animal husbandry;

2.3.6   Assure the administration to the Stock of only those medications, vaccines, feed additives and other animal health products which have been approved by the USDA and in accordance with the manufacturers' label instructions and acceptable management and sanitary practices;

2.3.7    Assure the acquisition and maintenance for Owner of all required municipal, state and federal permits and/or licenses necessary in connection with construction and operation of the Facilities and the maintenance of the Stock;

2.3.8   Dispose of all waste and dead animals promptly and in a manner consistent with accepted management practices, and in strict compliance with all applicable state and federal environmental, public health and other laws and regulations;

2.3.9   Arrange deliveries of all pigs to the nurseries, finishers and slaughter plant;

2.3.10   Coordinate the sale and delivery of feeder pigs to Growers, as defined in the New Generation Feeder Pig Sales Agreement between Owner and Growers;

2.3.11   Establish and enforce good biological security, vaccination, sanitation and health practices;

2.3.12   Operate the Facilities including the handling and disposal of waste and carcasses, in compliance with all local, state, and federal laws and regulations pertaining to environmental, employment, workplace safety, transportation, taxation, public health or animal production matters;

2.3.13   Assure that the feeder pigs, when sold to Growers, are free and clear of any liens or encumbrances; and

2.3.14   Arrange for Owner insurance coverage in amounts reasonably satisfactory to Owner, insuring the Facilities and the Stock against damage or destruction and protecting against claims of injury to any persons resulting from the business.

2.4   Financial Controls.   Bell shall establish and maintain a system of production and financial record keeping (using a generally accepted system of production record keeping such as, but not limited to, "Pig Champ"), Facilities accounting information and financial controls for the Facilities as follows:

-4-

2.4.1   On a monthly basis Bell shall maintain a set of books and records in accordance with GAAP that reflects the production and financial results, in such detail as may be agreed upon between Owner and Bell from time to time;

2.4.2   On a monthly basis Bell shall assimilate Owner's monthly Statement of Operations of the Facilities and the production results with general Owner financial information and provide a report, in such detail as may be agreed upon between Owner and Bell from time to time;

2.4.3   On a monthly basis Bell shall coordinate the Facilities financial information with Owner's general financial information and prepare and analyze the:

    A.   Owner's Balance Sheet

    B.   Owner's Income Statement

    C.   Owner's over-all General Ledger

    D.   Owner's Statement of Cash Flows

    E.   Owner's Comparative Operating Statistics

2.4.4   Conduct or cause to be conducted certain administrative functions, including arrangement of financing, banking, financial reporting, insurance, legal, tax reporting, and other similar administrative functions.

2.4.5   On an annual basis:

    A.   Assist the Owner in the preparation of annual budgets for operating revenue and expense and capital expenditures for the Facilities. Budgets shall be prepared in advance of each fiscal year. Facilities cash flow projections shall accompany each operating budget. It is understood that budgets are only estimates and guidelines of future results and that budget overruns may occur.

    B.   Assist the Owner to project the long-term financial position of the Facilities through the preparation and review of a 5-year cash flow.

    C.   Maintain ongoing data accumulation to help determine customary statistics on the production results at the Facilities.

2.4.6   Bell shall provide qualified personnel to assist in establishing and maintaining the Owner's accounting system. Bell will maintain internal control procedures requested by Owner, and Owner shall be entitled to review and audit

-5-

accounting records and documents at its discretion. Bell shall receive from the Owner all Owner maintained monthly financial information.

2.5   **Dealing with Affiliates**. Bell may cause goods and services furnished under this Article II to be acquired from persons or entities affiliated with Bell, provided they are furnished on terms as favorable to the Owner as would be provided by independent third parties, and are of at least equal quality as could be obtained from such third parties.

### III.   Specific Responsibilities of Owner

3.1   **Policy Determination**. The Owner shall:

3.1.1   Establish policies relating to the activities at the Facilities;

3.1.2   Adopt budgets to establish guidelines for revenue and expense;

3.1.3   Establish the short-range and long-range goals of the Facilities;

3.1.4   Review and evaluate the performance of Bell in carrying out the policies and in attaining the goals established by the Owner;

3.1.5   Periodically review and confirm or change the policies, budgets and goals of the Facilities; and

3.2   **Auditors**. The Owner shall retain the services of a certified public accounting firm, at Owner's cost, to perform annual certified audits, to prepare tax returns, to prepare any other reports required for federal or state regulatory agencies which require licensure and/or certification, and to perform other necessary accounting services relating to the Facilities. While such certified public accounting firm shall be directly responsible to the Owner, it shall be expected to cooperate with and assist Bell and Owner in the development and maintenance of the Facilities accounting and financial control systems and in fulfilling the obligations of Bell hereunder. Bell shall not perform or have the responsibility for the performance of accounting services in connection with the activities arising hereunder, except as otherwise provided in Section 2.4.

3.3   **Operating Reports; Meetings**. During the term of this Agreement, the Owner shall, within 30 days of issuance, furnish to Bell copies of all monthly, annual or other periodic financial information, reports, projections (with assumptions), operating statistics and other analytical information pertaining to the Facilities (other than any such information received by the Owner from Bell).

3.4   **Owner Insurance**. During the term of Agreement, the Owner shall apply for and maintain, at Owner's expense, with reputable and financially sound insurance firms, policies of

-6-

insurance to insure itself and Bell against public liability (including contractual liability insurance as applicable to Owner's obligations under section 6.8), professional liability, workers' compensation, fire and extended coverage, boiler and machinery, property, all risk, and such other policies in amounts as necessary and proper for the ownership and operation of the Facilities. The Owner may obtain any additional insurance coverage that it deems advisable. The Owner agrees to include Bell as an additional insured on all such policies which permit such designation and to provide Bell with complete copies of such policies and certificates of insurance which evidence such coverage. Such policies shall be endorsed to provide that such insurance is primary to any insurance purchased directly by Bell, and is not excess or contributing insurance. If the Owner fails to obtain and maintain such insurance with amounts and coverage normally provided Bell in similar facilities managed by Bell, Bell may obtain such insurance for its own benefit, and the cost thereof shall be a reimbursable expense pursuant to section 5.2.

3.5    **Cooperation.** The Owner shall cooperate with Bell in every respect and shall furnish Bell all information required by it for the performance of its services and shall permit Bell to examine and copy any data in possession and control of the Owner affecting management and/or operation of the Facilities and shall in every way cooperate to enable Bell to perform its services satisfactorily.

3.6    **Banking.** The Owner shall maintain an account in the Owner's name at a federally insured bank and shall designate Bell as signatories of accounts therein. The account may be drawn upon to meet payroll obligations to employees of the Facilities as provided in Section 2.2. and operating expenses as provided in Section 2.3.

IV.    **Term and Termination.**

4.1    **Term.** This Agreement shall commence on the date set forth on the first page hereof and shall continue until terminated by the mutual written agreement of Bell and Owner or terminated for cause as provided in Section 4.2.

4.2    **Termination for Cause.** Notwithstanding the foregoing, this Agreement may be terminated by either party if the Owner's existence is terminated, or if the other files or has petition or complaint in receivership or bankruptcy filed against it which has not been dismissed within 30 days of such filing, or makes a general assignment for the benefit of its creditors, or if the other party fails to properly perform the obligations imposed upon it under this Agreement. In the event that a party elects to terminate this Agreement as a result of the occurrence of any event specified in the preceding sentence, it shall give the other party 60 days' written notice of such termination and of the cause therefor, and such termination shall be effective sixty (60) days after the mailing thereof, unless the stated grounds for termination have been remedied by the other party prior to that date.

4.3    **Consequence of Termination.** If this Agreement is terminated under section 4.1

-7-

or 4.2 above, Bell shall be entitled to an amount equal to its earned but unpaid compensation, together with full reimbursement of all costs and expenses otherwise reimbursable hereunder, payable immediately, and neither party shall have any further obligations to the other, except as provided in Section 6.8.

## V.  Compensation and Reimbursement

**5.1  Compensation.**  The Owner shall reimburse Bell for all of Bells direct and indirect costs allocable to performance of the services identified in Article II hereof, including without limitation salaries and benefits and other costs of Bells employees providing the services, out-of-pocket expenses, expenses for computers, materials and supplies, travel expenses, an allocable amount of general overhead, and legal, accounting and other consultants fees.  On a monthly basis Bell shall submit to the Owner a statement of costs and the Owner shall reimburse Bell the amount set forth on each monthly statement, within 15 days after receipt of such statement.  Bell shall submit an annual budget of Bells direct and indirect costs allocable to the performance of services hereunder to the Owner for its approval.

## VI.  General.

**6.1  Insurance Subrogation.**  No indemnity shall be paid to the other party under this Agreement where the claim, damage, liability, loss or expense incurred was or was required to be insured against by such other party for whose benefit such indemnity would run.  Any insurance policies obtained by the parties pursuant to this Agreement shall contain provisions or have the effect of waiving any right of subrogation by the insurer of one party against the other party or its insurer.  Each party hereby releases the other from any claims to the extent covered by insurance obtained by the parties pursuant to this Agreement.

**6.2  Standard of Care.**  Bell shall exercise good faith and ordinary care, and consider the best interests of the Owner in carrying out the duties an responsibilities of this Agreement.

**6.3  Entire Agreement.**  This Agreement sets forth the entire agreement relating to its subject matter, between Bell and Owner.  Any changes or modifications of this Agreement must be in writing and signed by all parties hereto.

**6.4  Assignment.**  This Agreement shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns.  Notwithstanding the foregoing, neither party shall, without prior written approval of the other party, assign any of its rights or obligations under this Agreement, except in the event of a merger of a party with or into another entity which has a net worth at least equal to that of the assignment party and which assumes all of such party's obligations, and the provision of notice thereof to the other party.

-8-

6.5   Governing Law.   This Agreement and its interpretations, validity and performance shall be governed by the laws of the State of North Dakota.   Each of the parties consents to the jurisdiction of the state and federal courts in North Dakota and to all venues therein, and each party waives all rights to a jury trial and punitive damages in any such proceeding.

6.6   Conditions Beyond Control of Parties.   Neither party shall be held liable for a failure to comply with any of the terms of this Agreement when such failure has been caused solely by fire, a swine disease epidemic in the general area of the Facilities, labor dispute, strike, war, insurrection, government restrictions, force majeure, or act of God beyond the control and without fault on the part of the party involved, provided such party uses due diligence to remedy any such default which can be remedied.

6.7   Notices.   Any notices, demands, consents or other communications hereunder (collectively, "notices") shall be in writing and, unless otherwise specifically provided, shall be deemed effective when delivered personally or sent by registered or certified mail, first class postage prepaid, addressed as follows:

6.7.1   If addressed to Bell:

Bell Farms
509 Dakota Avenue
Wahpeton, North Dakota  58075
Attention:  Rich Bell

With a copy to:

Russell F. Freeman, Esq.
Nilles, Hansen & Davies, Ltd.
1800 Radisson Tower
201 North Fifth Street
P.O. Box 2626
Fargo, North Dakota 58108

If addressed to Owner:

Executive Committee
Sun Prairie, A Partnership
509 Dakota Ave.
Wahpeton, ND 58075

With a copy to:

-9-

Ted Kessner
Crosby, Guenzel, Davis, Kessner
& Kuester
134 S. 13th St., Suite 400
Lincoln, NE 68508

or as to any party, at such other address as such party may specify to the other party in a notice given in compliance with this section 6.7.

6.8    **Indemnification.**  The Owner shall defend, indemnify and hold Bell harmless from all costs incurred by Bell in the defense of any claims relating to the Facilities brought against Bell or any action relating to the Facilities in which Bell is named as a party, including reasonable attorney fees, costs of investigation, court costs and other such expenses except as and to the extent caused by the negligence, nonfeasance or malfeasance of Bell. This indemnification obligation shall survive termination of this Agreement, and is subject to the waiver of subrogation provisions of section 6.1

Bell shall defend, indemnify and hold the Owner harmless from and against all claims, actions, liabilities and expenses (including without limitation reasonable attorneys fees) which relate to or arise from any breach of this Agreement by Bell. This indemnification obligation shall survive termination of this Agreement, and is subject to the waiver of subrogation provisions of Section 6.1.

6.9    **Separability.**  In case any one of the provisions hereof is determined to be invalid, illegal or unenforceable in any respect, the validity of the remaining provisions with in no way be affected, prejudiced or disturbed thereby.

6.10    **Arbitration.**  Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association (AAA) and judgement upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The arbitration proceedings shall be conducted in the City of Wahpeton, ND, U.S.A. or such other location as the parties may mutually agree. The arbitration shall be conducted by one (1) arbitrator mutually agreed upon between the parties. If the parties are unable to agree upon a single arbitrator within thirty (30) days of commencement of arbitration, each party shall select one arbitrator and the selected arbitrators shall select a third arbitrator in accordance with AAA Rules.

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement on the day and year first above written.

-10-

BELL FARMS LLP

By: _____

its _____


SUN PRAIRIE, A PARTNERSHIP

By: _____

its _____ CEO _____

EXHIBIT B

Description of Phase I and II

Phase I is an operation of 24 wean to finish barns totaling 48,000 head and an operation of 24 wean to finish barns totaling 48,000 head.

Phase II is an operation of 25,000 sow and 250,000 head of finishing capacity.



## EXHIBIT C

### Legal Description of Premises

| BIA Tract Number | Legal Description |
| --- | --- |
| T-63 | SE 1/4, Sec 27, T42N, R30W |
| T-929.5 | E 1/2, Sec 16, T43N, R30W |
| T-1709.5C | SW 1/4, Sec 27, T42N, R30W |
| T-2113.5 | NE 1/4, Sec 16, T43N, R31W |
| T-2136.5 | S 1/2, Sec 30, T42N, R31W |
| T-5841 | NW 1/4, Sec 24, R43N, R31W |
| T-5890 | NE 1/4, Sec 15, T43N, R31W |
| T-5897 | NW 1/4, Sec 14, T43N, R31W |
| T-5901 | NW 1/4, Sec 23, T43N, R31W |
| T-5908 | SE 1/4, Sec 16, T43N, R31W |
| T-5960 | SE 1/4, Sec 17, T42N, R31W |
| T-5969 | NE 1/4, Sec 24, T42N, R31W |
| T-5977 | SW 1/4, Sec 20, T42N, R30W |
| T-5980 | Lots 3 & 4 and E1/4, SE 1/4, Sec 19, T42N, R30W |
| T-5991 | NW 1/4, Sec 27, T42N, R30W |
| T-11188 11133 | NW 1/4, Sec 16, T42N, R31W |
| T-11233 | SW 1/4, Sec 23, T43N, R31W |
| T-11666 | N 1/2, Sec 32, T42N, R31W |

### Potential Road Access Sites

| | |
| --- | --- |
| T-3860 | Lots 1 & 2 and E 1/2, NE 1/4, Sec 30, T42N, E30W |
| T-5898 | SW 1/4, Sec 14, T43N, R31W |
| T-5899 | SE 1/4, Sec 14, T43N, R31W |
| Rosebud Sioux Tribe Allotment RS-2053 | Lots 3 & 4 and E1/2, SE 1/4, Sec 30, T42N, R30W |

(a)    Except as noted

Together with all easements and rights appurtenant thereto, if any.



04/27/01  FRI 13:49 FAX 6125407827      DORSEY & WHITNEY                            ☒037

EXHIBIT D





Figure 1-2.  Proposed Hog Facility Sites Overlain on Geologic Map of Project Area.

4

EXHIBIT D



31 W

43 N

43

NOTE:
S1 THRU S5 DENOTES 5,000 HEAD SOW UNI
F1 THRU F8 DENOTES 48,000 HEAD FINISHIN
SITES

CEDAR BUTTE
POST OFFICE    SD 44

31 W

ROSEBUD FARMS    0.5 MILE    1.0 MILE    1.0 MILE    1.0 MILE    1.0 MILE    1.0 MILE

## EXHIBIT E

### Permitted Encumbrances

Easements for highway right-of-way and utilities of record



EXHIBIT F

<u>Schematic Plans and Specifications</u>

The Schematic Plans and Specifications for the Project were prepared by National Swine Builders, LLC located at 412 Main Avenue, P.O. Box 205, Clear Lake, IA 50428. The telephone number for National Swine Builders is (515)357-1561. National Swine Builders has copies of the schematic plans and specifications.



## EXHIBIT G

### Tribal Licensing Permit and Governmental Approval Requirements

"Business" means any regular or temporary business activity engaged in by any person (includes partnership, joint venture, and corporation) for purposes of conducting a trade, profession or commercial activity involving the sale (which means the transfer, exchange or barter, conditional or otherwise, of the ownership of, title to, or possession of real or personal property for consideration).

The Business License requirement applies to all persons engaged in business within the exterior boundaries of the reservation (with exemptions, described in §16-1-204, which are not applicable to our situation).

All applications must include:

A. Description of the type of business;

B. Name and address of the owner or owners of the business;

C. Trade name, if any, to be used by the company;

D. Locations on the reservation at which the business will be conducted;

E. Sworn statement that the applicant will comply with all Tribal law applicable to the applicant's business;

F. Statement that the applicant consents to Tribal Court jurisdiction and service of process in matters arising from the conduct of business;

G. Name, address and signature of the agent who will accept service of process on behalf of the company.



EXHIBIT H

Tribal Taxes, Assessments, Fees and other Charges

1.    TECRO as modified.
2.    Land Lease Use Tax.

EXHIBIT I

Bureau of Indian Affairs Reclamation Plan

In the event that the Lease is terminated by reason of abandonment of the Premises by Lessee, Lessee as an operating expense under this agreement, shall be solely responsible to reclaim and restore the premises in the following manner:

1.    Organic and/or Inorganic Wastes: Sludge accumulation will be monitored on an annual basis. Accumulated depths will be determined by using infrared sensing mechanical measuring devices (example: Markland Mark 10 LED). This device will indicate depth of sediment build-up above the anaerobic digester bottom when read in a vertical position from floating device (boat) on digester surface. When sludge accumulation reaches or exceeds the sludge accumulation design volume, the digester will be de-watered by approximately 85%. The remaining sludge and liquids will be mechanically agitated and pumped as a slurry onto adjacent designated disposal areas. Caution will be taken to insure the digester liner integrity during sludge removal. The slurry will be analyzed for N.P & K and soil injected with trail hose equipment. The custom applicator equipment can pump 1,000 gpm through a 6" line and soil injects the slurry waste. Wastes will be soil applied consistent with sound agronomic practices.

2.    Anaerobic Digester: In the event this swine operation is discontinued, the buildings will be depopulated and cleaned. The anaerobic digester will be dewatered and sludge and sediment will be removed consistent with the previously mentioned plan. All waste will be analyzed for N.P & K and applied onto designated and approved application areas consistent with sound agronomic practices. The anaerobic digester will be left structurally intact. The anaerobic digester will be filled with fresh water at approximately 85% of capacity to protect the liner. All appropriate governing agencies will be notified of the abandonment of this facility.

3.    All structures will be moved from the site. If it is impractical to move the structures, they will be dismantled and removed from the site.

4.    All poured concrete will be lifted, stockpiled and removed from the site.

5.    All excavated areas shall be backfilled and reshaped to complement the existing terrain. All slopes shall be set to grade of not steeper than a 4 to 1 slope.



6.    Top soil shall be placed on all disturbed areas that require reseeding prior to establishing a permanent cover.

7.    All disturbed areas will be established to a permanent cover to minimize erosion. A seedbed will be prepared that is free, or nearly free, of all competitive vegetation. A firm seedbed will be established. A seedbed is firm enough when it will support the weight of a person and their shoe or boot heel does not sink into the soil over a maximum of one half inch when they walk across the area to be seeded.

8.    A seed drill shall be used to place the seed at the desired depth. The drill shall be equipped with a feeding mechanism that will provide a uniform flow of seed at the desired rate and packer wheels to press the soil firmly over the seed. In lieu of packer wheels, the area may be cultipacked after seeding. If difficulty is encountered with uniform seed flow through the drill, cracked corn, cracked wheat or rolled oats can be added to the seed box to aid in seed flow.

9.    Seeds of most grasses should be planted at a depth between 1/4 to 3/4 inch.

10.    The seeding mixture and seeding rates are as follows:

| | |
|---|---|
| Western Wheatgrass | 6.0 lbs. pure live seed per acre |
| Green Needlegrass | 4.0 lbs. pure live seed per acre |
| Side Oats Grama | 2.0 lbs. pure live seed per acre |
| Little Bluestem | 2.0 lbs. pure live seed per acre |
| TOTAL SEED | 14.0 lbs. pure live seed per acre |

11.    Seed should be of local origin. (Harvested from points not over 200 miles away from the site.)

12.    The seeding must be done between November 1 to April 15. This period applies to mixtures of cool-season species or mixtures of cool and warm-season species. Seeding must not be done when the soil is frozen so hard that seed cannot be planted at the proper depth and properly covered.

13.    If broadleaf weeds emerge in the first year in significant amounts to interfere with the establishment of the native grass seeding, herbicides may be used for control. The best control will be attained when weeds are in the early stages of growth and the grass seedings have reached the three leaf stage of growth.

14.    All seeding areas must be fenced and protected from grazing livestock to the end of the second growing season.



## GUARANTY

THIS GUARANTY ("Guaranty") is made _November 2_ 1998 by RICHARD BELL ("Guarantor"), in favor of the ROSEBUD SIOUX TRIBE, a federally recognized Indian Tribe (the "Tribe").

The Tribe and Sun Prairie, a Nebraska General Partnership (the "Lessee") have entered into a certain Land Lease (the "Lease") dated as of _September 8_ 1998.

NOW, THEREFORE, in consideration of the Tribe entering into the Lease, Guarantor hereby agrees with the Tribe as follows:

1.   Guaranty.  Subject to the provisions hereof, the Guarantor hereby unconditionally guarantees to the Tribe the full and complete payment and performance by the Lessee of its obligations under the Lease. Provisions to the contrary, if any, contained in this Guaranty notwithstanding, Guarantor's obligations under this Guaranty shall be subject to and limited by the provisions of paragraph 51 of the Lease.

2.   Irrevocability.  This Guaranty shall be irrevocable and shall continue, subject to the limitations stated in paragraph 1 of this Guaranty, so long as the Lessee's obligations under the Lease or any part thereof, shall remain unpaid or unperformed.

3.   Severability.  If any provision of this Guaranty shall be invalid, illegal or unenforceable, such provision shall be severable from the rest of this Guaranty and the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

4.   Headings.  Headings of the paragraphs of this Guaranty are inserted for convenience only and shall not be deemed to constitute a part hereof.

This Guaranty has been executed and delivered as of the date first above written.

_Richard Bell_
Richard Bell



# United States Department of the Interior



BUREAU OF INDIAN AFFAIRS
Aberdeen Area Office
115 Fourth Avenue S.E.
Aberdeen, South Dakota 57401

IN REPLY REFER TO:
Land Titles and Records Office
MC-306A

SEP 1 8 1998

## MEMORANDUM

To:     Superintendent, Rosebud Agency

From:   Area Director, Aberdeen Area

Subject:  Land Lease and Leasehold Mortgage, Rosebud Farms Pork Production Facility

Enclosed is the original document relative to the Rosebud Farms Pork Production Facility. We have officially recorded the enclosed Land Lease and Leasehold Real Estate Mortgage in our Land Titles and Records office. A microfilm copy of the subject documents was produced and is on file in our Land Titles and Records office. The Land Lease was recorded under Document No. 345-54214. The Leasehold Mortgage was recorded under Document No. 345-54215.

If you have any questions concerning this matter, please refer them to Jim Geffre, Supervisory Legal Instruments Examiner, at 605-226-7393.

Attachments

cc: Viken, Viken, Pechota, Leach & Dewell, LLP, Rapid City, South Dakota
    Dorsey & Whitney, LLP, Minneapolis, Minnesota