RECEIVED 1993

UNITED STATED DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
CENTRAL DIVISION

1/10

ROSEBUD SIOUX TRIBE,                )
a federally recognized Indian Tribe,    )
and SUN PRAIRIE, a Nebraska          )
general partnership,                 )
                                     )
            Plaintiffs,              )
                                     )
        v.                           )       Civ. No. 99-3003
                                     )
KEVIN GOVER, Assistant Secretary,    )       DECLARATION OF
Indian Affairs, U.S. Dept. of Interior,  )   ELIZABETH A. BELL
and BRUCE BABBITT, Secretary of      )
the U.S. Dept. of Interior,          )
                                     )
            Defendants,              )
                                     )
CONCERNED ROSEBUD AREA               )
CITIZENS, et al,                     )
                                     )
            Intervenor-Defendants    )
                                     )

I, Elizabeth A. Bell, declare:

1.    I am the Senior Advisor on Environment and Natural Resources to the Assistant

Secretary - Indian Affairs

2.    As the Senior Advisor on Environment and Natural Resources, I advise and represent

the Assistant Secretary on issues related to the environment and natural resources.

3.    I first became involved in advising and representing the Assistant Secretary regarding

the Rosebud Sioux Tribe's proposed Pork Production Facility (Project) in September 1998

4.    On or about September 22, 1998, I was first informed by Sadie Hoskie, Director,

Tribal Assistance Program, United States Environmental Protection Agency (EPA) Region 8, that

the Region had serious concerns about an Environmental Assessment (EA) and Finding of No

Significant Impact (FONSI) prepared by the Aberdeen Area Office of the Bureau of Indian Affairs (BIA) on a proposed large-scale pork production facility for the Rosebud Sioux Tribe.

5.    On or about the last two weeks of September 1998, I received by telefax a number of comment letters from the South Dakota Peace and Justice Center, the Black Hills Group Sierra Club, the Indigenous Environmental Network, the Mortenson Law Offices on behalf of the Concerned Rosebud Area Citizens, the Prairie Hills Audubon Society, Neola Spotted Tail, Oleta Mednansky and Marlene K. Halverson raising various concerns with the Project, the EA, the FONSI and potential impacts to cultural resources and threatened and endangered species.

6    On September 22 and October 6, 1998, I spoke by telephone with Tom Goldtooth, Indigenous Environmental Network, who expressed concerns with the Project and the adequacy of the EA and the FONSI supporting the Project.

7    Also, on September 22, 1998, I spoke by telephone with Richard Mednansky who expressed concerns with the Project and the adequacy of the EA and the FONSI supporting the Project.

8    On or about September 23, 1998, I received a copy of the EA and the FONSI. Shortly thereafter, I received a number of related background documents and comment letters, including EPA's September 22, 1998, letter to President Norman Wilson, Rosebud Sioux Tribe, and Larry Burt, Rosebud Agency Superintendent, raising serious concerns about the environmental impacts of the Project, from the Aberdeen Area Office and the Rosebud Agency   Since receiving these documents, I have personally reviewed most of their content and consulted extensively with, among others, BIA environmental personnel at both the Central Office and the Aberdeen Area Office, the Aberdeen Area Director, the Rosebud Agency Superintendent and attorneys in the Office of the Solicitor, Division of Indian Affairs (SOL-DIA).

9       On September 28, October 1 and November 2 and 4, 1998, I spoke by telephone with Patricia Lane, counsel for the Humane Society of the United States (HSUS), regarding HSUS's concerns with the Project and the adequacy of the EA and the FONSI supporting the Project. I understood from those conversations that HSUS was preparing to bring a lawsuit in federal court to enjoin the Project pursuant to the National Environmental Policy Act (NEPA), the National Historic Preservation Act (NHPA), the Endangered Species Act and the Administrative Procedures Act (APA) and that the lawsuit was imminent.

10.     On September 29, 1998, I first consulted with Roy Pulfrey, BIA Aberdeen Area Environmental Scientist, regarding the Project, the EA and the FONSI. Under the Indian Affairs Manual, Part 59, Chapter 3, the Area Environmental Scientist is responsible for "coordinating National Environmental Policy Act (NEPA) and other environmental review and analysis activities in the Area."

11.     Also on September 29, 1998, I had a conference call with representatives from BIA's Environment and Cultural Resources Management Division (ECRM) (formerly the Environmental Services Staff), the Aberdeen Area Office, including the Area Director, and the Rosebud Agency, including the Agency Superintendent, to get background information on the development and approval of the EA, the FONSI, the Land Lease and the Project generally.

12.     Also, on September 29, 1998, I spoke again by telephone with Ms. Hoskie regarding an EPA meeting with the Tribe and the Bell Farming Group that was to take place in Minnesota, to discuss the development of an Environmental Impact Statement (EIS) or a Supplemental EA and the issuance of a National Pollution Discharge Elimination System (NPDES) permit under the Clean Water Act for the Project. On October 6, 1998, I spoke again by telephone with Ms. Hoskie, regarding the Bell Farming Group's rejection of EPA's proposal to apply for an NPDES permit.

13.    On or about October 5, 1998, I received by telefax a memorandum from Larry Burr summarizing the Agency's activities related to its approval of the FONSI for the Project

14.    On October 6, 1998, I spoke by telephone with President Wilson regarding the security of the Project's investors given the Project's opposition and the uncertainty of BIA's approval of the Land Lease due to the alleged NEPA violations and that the Tribe was to be kept informed of and involved in BIA's review of the EA, the FONSI and the Land Lease approval.

15.    On October 14, 1998, I met with representatives from HSUS, including Patricia Lane, during which they again expressed their concerns with the Project and the adequacy of the EA and the FONSI supporting the Project.

16.    On or about October 15, 1998, I received and reviewed a copy of EPA's comments on the final EA and FONSI for the Project, which in summary stated that EPA found the EA to be inadequate and the FONSI unsupported by the information in the EA

17     On October 26, 1998, I participated in a telephone conference call with, among others, President Wilson, Rich Bell, President of the Bell Farming Group, attorneys for the Tribe and the Bell Farming Group, the Assistant Area Director, the Rosebud Agency Superintendent and attorneys from the SOL-DIA, in which I informed the Tribe and the Bell Farming Group of the threatened litigation by HSUS. During the call, I raised the possibility that, if there were litigation, a court might require additional environmental analysis or an EIS under NEPA before the Project could move forward

18     On or about October 30, 1998, I was informed by Ms. Lane that she would no longer be participating in the case, and that Gretchen Biggs of the Animal Law Center, would be the new lead counsel.

19.    On November 2, 1998, I spoke again with President Wilson about an upcoming site

4

visit from EPA, some ongoing activities at the site by personnel from the Rosebud Agency and the closure plan for the Project.

20.    On November 6, 1998, I participated in a telephone conference call with President Wilson, Ken Dewell, outside counsel to the Tribe, Rich Bell, Greg Fontaine, counsel to the Bell Farming Group and attorneys from SOL-DIA. During the call, I again raised the threatened litigation, now being raised by Ms. Biggs and her clients, and that the Project was at risk of being enjoined. I highlighted areas of concern regarding the environmental analysis in the EA that might be the focus of Ms. Biggs' litigation. I again raised the possibility that a federal judge might require additional NEPA analysis, including the possibility of an EIS.

21.    Sometime prior to November 10, 1998, I received a couple of telephone calls from the President's Council on Environmental Quality (CEQ), informing me that they had received copies of public comments on the EA and the FONSI for the Project, that these comments raised various concerns with potential environmental impacts from the Project and with the NEPA process that was followed to evaluate these impacts, that based upon their own review of the EA, they had serious concerns with the adequacy of the environmental analysis in the EA and with the NEPA process and that they would like to set up a meeting with BIA to further discuss these concerns.

22.    On November 15, 1998, I traveled to the Rosebud Sioux Indian Reservation in South Dakota with personnel from the BIA's ECRM Division and the SOL-DIA. On November 16, 1998, I toured the Project site with representatives from the Bell Farming Group, EPA and BIA. The same day, I attended a meeting at BIA offices with, among others, President Wilson, Rich Bell, Cora Jones, Aberdeen Area Director and Larry Burr   At the meeting I raised the issue of the threatened litigation by Ms. Biggs' clients and the possibility that the Project might be enjoined in the course of this litigation. I again raised the possibility that a federal judge might require additional NEPA

analysis, including the possibility of an EIS.

23      On November 18, 1998, I spoke by telephone with Kimi Matsumoto, Office of Regional Counsel, EPA Region 8, regarding Titles 18 and 19 of the Tribal Code, including the draft amendments to Title 19 relating to the regulation of Confined Animal Feeding Operations. Also, during this telephone call, Ms. Matsumoto informed me that Rosebud Sioux tribal members were on the agenda for the next meeting of EPA's National Environmental Justice Advisory Council to discuss the Project, that the citizen groups were still threatening litigation and that 150 students at the local college had signed a petition objecting to the Project.

24      On November 23, 1998, the Concerned Rosebud Area Citizens, et. al., filed suit in the District Court, District of Columbia, to enjoin the Project from proceeding, citing violations of NEPA, NHPA and APA.

25.     Also on November 23, 1998, I participated in a conference call with representatives from the SOL-DIA and DOJ, and with the attorneys for the Tribe and the Bell Farming Group regarding whether to try to have the lawsuit transferred to South Dakota and whether Rich Bell would be able to find other facilities to house the pigs or contractors to take over the pigs in case the project was delayed or stopped. Also, we discussed the Tribe's role in the lawsuit, including the possibility of the Tribe becoming a party, but at a minimum of having the Tribe participate through consultations with the BIA. I again informed them of the possibility that the Project may be enjoined until further NEPA action is completed and that the Tribe and the Bell Farming Group may want to consider interim alternative business arrangements.

26.     Also on November 24, 1998, I spoke by telephone with Greg Fontaine to update him on the status of the lawsuit and internal discussions with EPA and CEQ.

27      On December 3, 1998, I spoke by telephone with President Wilson to update him on

the status of the lawsuit and internal discussions with EPA and CEQ

28.    On December 7, 1998, the Assistant Secretary met with President Wilson in Washington, D.C., to discuss the status of the lawsuit and to consult with the Tribe about how to respond to the lawsuit and how to address the various NEPA and other environmental concerns that had been raised by the plaintiffs, EPA and CEQ

29    Also on December 7, 1998, I, and an attorney from the SOL-DIA met with Ken Dewell and Eric Antoine, in-house tribal counsel, in Washington, D.C. to discuss specific federal concerns, including those that had been raised by CEQ and EPA, with the environmental analysis in the EA. I pointed out these concerns on a page by page, issue by issue basis

30.    Also on December 7, 1998, I, with counsel from DOJ and the SOL-DIA, met with President Wilson and Ken Dewell at DOJ offices in Washington, D C to discuss the risks to the Project posed by the current litigation. I again raised the possibility of the Project being enjoined, and that additional environmental analysis may be required to bring the Project into compliance with NEPA.

31.    On December 8, 1998, I participated in a conference call with DOJ and the attorneys for the Tribe and the Bell Farming Group, during which we discussed limiting the Project to Phase I (first three sites) until an EIS could be completed for the entire project

32.    On or about December 11, 1998, I received a copy of a letter from the South Dakota Department of Environment and Natural Resources (DENR) to President Wilson relaying DENR's concerns with the Project.

33.    On December 15, 1998, I participated in a conference call with DOJ, tribal environmental personnel and attorneys for the Tribe and the Bell Farming Group, the purpose of which was to gather technical information on specific issues the plaintiffs had raised regarding the

7

construction and operation of the Project and the time frame for finishing construction on and beginning operations at site I. During this meeting we also discussed the best means of communications with the Tribe and it was agreed that all communications were to go through the Tribe's attorney. During this conference call, the Tribe and the Bell Farming Group were specifically informed that any construction on the Project would be done at their own risk.

34. On December 16, 1998, I participated in a conference call with DOJ, the SOL-DIA, the plaintiffs' attorneys and the attorneys from the Tribe and the Bell Farming Group, the purpose of which was to have the Tribe and the Bell Farming Group respond to specific technical issues and timing questions of concern to the plaintiffs.

35. On or about December 21, 1998, I suggested and received approval to hire by contract an independent expert in the field of agricultural engineering to assist BIA in its review of the South Dakota DENR letter and to generally assess the environmental soundness and technical design quality of the Project.

36. On December 22, 1998, I spoke by telephone with Greg Fontaine about when operations were expected to begin at site I and about technical information the Tribe and the Bell Farming Group were to provide to me in response to the concerns raised by the South Dakota DENR in their December 11, 1998, letter to President Wilson.

37. On or about December 23, 1998, I participated in a conference call with the SOL-DIA, DOJ and Ken Dewell about reaffirming the Tribe's and BIA's commitment to ensuring that the Project is environmentally sound and that no pigs would be allowed onto site I until all the South Dakota DENR issues were resolved. Also, I reaffirmed BIA's commitment to meet with the Tribe and the Bell Farming Group in Denver, Colorado on January 11, 1999, and discussed a possible meeting between the plaintiffs and the Tribe to discuss the plaintiffs' concerns about impacts to

8

cultural resources.

38.     On or about December 28, 1998, the BIA hired Dr. Albert J. Heber, Department of Agriculture and Biological Engineering, Purdue University to assist BIA in its review of the South Dakota DENR letter and to generally assess the environmental soundness and technical design quality of the Project.

39.     On January 11 and 12, 1999, I met with, among others, BIA environmental personnel from the ECRM Division and the Aberdeen Area Office, Dr. Heber and representatives from EPA, the Tribe and the Bell Farming Group, including the attorneys for the Tribe and the Bell Farming Group in Denver, Colorado to address the concerns raised in the South Dakota DENR letter.   At the meeting, I went through the DENR letter issue by issue with the participants.  Each issue was either responded to by EPA, the Tribe and/or the Bell Farming Group with existing information that fully addressed the State's concern or the Tribe and the Bell Farming Group committed to obtaining the information and revising the Project's technical and conceptual design specifications and related documents appropriately and submitting them to BIA and EPA for review.

40.     Over the next two weeks I spoke regularly with representatives from the Tribe and the Bell Farming Group, including the attorneys for the Tribe and the Bell Farming Group, regarding information the Tribe and the Bell Farming Group were supposed to submit to BIA and EPA as a follow up to the January 11 and 12 meeting in Denver, Colorado.  Also, I, with representatives from the SOL-DIA and DOJ, spoke with the attorneys representing the Tribe and the Bell Farming Group on a number of occasions in this same time period to apprise them of developments in the lawsuit, including more urgent and detailed discussions about the possibility of the Project being enjoined or the possibility of BIA determining that BIA's approval of the Land Lease was, and always had been, void for failure to fully comply with NEPA, and that the Tribe and the Bell Farming Group may.

therefore, want to consider interim alternative business arrangements

42.    On or about January 18, 1999, I received from the Bell Farming Group the initial set of revised technical and conceptual design specifications for review by BIA and EPA. I, other BIA Central Office and Aberdeen Area environmental personnel and Dr. Heber immediately began reviewing these revised specifications and related documents. On or about January 22, 1999, I received supplemental information on the revised technical and conceptual design specifications, and I, other BIA environmental personnel and Dr. Heber, continued our review of the full submission to ensure that it was consistent with all the agreements we had reached at the January 11 and 12, 1999, meeting in Denver, Colorado.

43.    On or about January 19, 1999, I received a copy of a report prepared for me by Dr. Heber on sludge accumulation in a covered anaerobic lagoon digester

44.    On or about January 21, 1999, I received a copy of a letter from Dr. Heber to the Assistant Secretary relaying his conclusions about the environmental soundness and technical design quality of the Project

45.    On or about January 27, 1999, I received a copy of a letter from Kerrigan G. Clough, Assistant Regional Administrator, Office of Partnerships and Regulatory Assistance, EPA Region 8, to the Assistant Secretary relaying EPA's conclusions concerning the latest submission from the Bell Farming Group related to the design, construction and operation of site I.

10

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 12, 1999.

Elizabeth A. Bell
Senior Advisor on Environment and
  Natural Resources
U. S. Department of the Interior
Washington, D.C. 20240

There was supposed to be a 30 day review period but the BIA did not clr

They did not wait 30 days to make decision, the wanted 30 days to implement the decision

# FINDING OF NO SIGNIFICANT IMPACT

## PORK PRODUCTION FACILITY

## MELLETTE COUNTY, SOUTH DAKOTA

Based on the final Environmental Assessment (EA) for a proposed pork production facility to be located on trust land owned by the Rosebud Sioux Tribe in Mellette County, South Dakota, I have determined that by implementation of mitigation measures specified in the EA, the proposed project will have no significant impact on the quality of the human environment. In accordance with Section 102 (2) (c) of the National Environmental Policy Act of 1969, as amended, an environmental impact statement will not be required.

This determination is supported by the following findings:

1. Public involvement was encouraged by holding a meeting at Norris/Blackpipe on June 15, 1998; and by promoting public review of a draft Environmental Assessment. Additional analysis and development of meaningful mitigation measures were a result of comments by the public.

2. The EA thoroughly discloses the environmental consequences of the proposed action and also the "no action" alternative.

3. Several measures to protect the environment are detailed in Chapter 5 Environmental Commitments - Mitigation Measures.

4. The proposed action is planned to not jeopardize threatened and endangered species. A special American Burying Beetle survey will be conducted.

5. The project sponsors will maintain compliance with the National Historic Preservation Act. Appropriate field surveys will be conducted to ensure cultural resources are identified and protected. Should undiscovered archeological remains be encountered during project ground-disturbing activities, work will stop in the area of discovery and the stipulations of 36 CFR 800.11 will be followed.

6. The project sponsors are committed to adherence to all appropriate federal laws and regulations.

7. Local governments and infrastructure will not suffer undue fiscal burdens as a result of the proposed project.

8. The proposed action will improve the economic and social conditions of the affected Indian community.

Construction activities will not commence until 30 days after advertisement of this finding.

Larry J. Burr
Agency Superintendent
Rosebud Agency
Bureau of Indian Affairs
U. S. Department of the Interior
August 14, 1998

Publ.: August 19, 1998