IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CONCERNED ROSEBUD AREA CITIZENS, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 05-CV-01275 |
| GALE NORTON, et al., | ) ) | |
| Defendants. | ) ) ) | |

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION
TO DISMISS OR, ALTERNATIVELY, TO TRANSFER VENUE**

Plaintiffs' arguments in Opposition to the Federal Defendants' Motion to Dismiss or, Alternatively, to Transfer Venue boil down to an assertion that because Plaintiffs chose to file their complaint in this Court, there should be no transfer of venue to their home district. Yet it is evident from both the face of the Complaint and Plaintiffs' response that this lawsuit is fatally flawed, for reasons that include but go beyond filing in a jurisdiction in which venue is not proper. The Plaintiffs seek a declaratory judgment from this Court[1] setting aside a consent order and judgment entered into by Judge Richard H. Battey of the District of South Dakota on May 19, 2005,[2] (ending nearly three years of litigation in which Plaintiffs' counsel represented, as

---

[1] Complaint, Prayer for Relief, ¶¶ 1,2.

[2] Order and Judgment by Consent, <u>Sun Prairie v. Cason</u>, No. 02-3030-RHB (D. S.D. May 19, 2005) (Exh. 1 to Defendants' Memorandum in Support of Motion to Dismiss or, Alternatively, to Transfer Venue).

intervenors, three of the four parties he currently represents[3]) on the basis of an alleged violation of the procedural requirements of the National Environmental Policy Act ("NEPA"). [4] Moreover, NEPA compliance and the impact of the agency's decisionmaking on the facility operator were directly raised in the South Dakota litigation.[5] The resolution of these issues in the Consent Judgment provides the Bureau of Indian Affairs ("BIA") the right to a "reasonable time period" within which to review and if appropriate supplement prior NEPA documentation. Judge Battey retains continuing jurisdiction over the Consent Judgment, including the "reasonable time" provision. This Court should either dismiss the lawsuit pursuant to 28 U.S.C. §1406(a) or transfer the case to Judge Battey based on his continuing jurisdiction over the Judgment.[6]

There are several other fatal flaws in Plaintiffs' self-serving strategy to effectively

---

[3] Concerned Rosebud Area Citizens, South Dakota Peace and Justice Center, and the Humane Farming Association.

[4] Complaint ¶¶ 34-41.

[5] See Memorandum Opinion Regarding Motions to Dismiss, Sun Prairie v. Martin, No. 02-3030 RHB (D. S.D. June 5, 2003) (copy attached). Judge Battey's ruling held that the Bureau of Indian Affairs ("BIA") did not provide Sun Prairie, the operator of two "hog farm" sites on the Rosebud Sioux Tribe Reservation, due process when it determined on January 27, 1999, that BIA's approval of a lease for the projects was void for failing to fully comply with NEPA. The intervenors, represented by Mr. Dougherty, participated in argument on the Motions to Dismiss which resulted in the ruling and the intervenors filed a memorandum with the Court.

[6] Plaintiffs do not discuss §1406 in their reply. Instead, they primarily focus on the administrative history of the FONSI determination that was subsequently withdrawn by the Department of the Interior. For reasons noted below, that history is irrelevant to a determination of whether Plaintiffs' claims should be heard. Plaintiffs also cite Concerned Rosebud Area Citizens v. Babbitt, 34 F. Supp. 2d 775 (D.D.C. 1999), in which the court declined to order transfer. There, the issue was essentially whether venue should be in South Dakota for the convenience of local witnesses who might testify at a hearing. See id. at 776. The Court's decision apparently was based on factors not present here, including the implicit judgment that transfer would delay adjudication of a motion for preliminary injunction. Id. at 776-77.

transfer jurisdiction from Judge Battey to this Court. If, as the Plaintiffs apparently contend, the Consent Judgment should be ignored and this Court review the adequacy of the administrative record of an Interior Department NEPA decision that was finalized more than six years ago, Plaintiffs' claim is accordingly time-barred, pursuant to the six-year statute of limitations applicable to suits under the Administrative Procedures Act ("APA"), 28 U.S.C. §2401.

Alternatively, if the Consent Judgment means what it says, and the agency is entitled to a "reasonable time" to determine whether and to what extent to supplement prior environmental impact analyses or require an entirely new impact statement, Plaintiff's Complaint should be dismissed because there is no final agency action, the case is not ripe for judicial review, and plaintiffs have not exhausted the administrative process.

A brief review of the procedural history sets the stage for our arguments.

**THE PERTINENT PROCEDURAL HISTORY**

In 1998, the Rosebud Sioux Tribe and Sun Prairie finalized a lease for the development of 13 hog sites on the Reservation. An environmental assessment was conducted by the Bureau of Indian Affairs ("BIA") pursuant to NEPA, resulting in a Finding of No Significant Impact ("FONSI") which was issued on August 14, 1998. The BIA then approved the lease on September 16, 1998. The present-day Plaintiffs challenged the lease in this District, arguing that its issuance violated NEPA. As noted in our initial Memorandum and in Plaintiffs' Reply, on January 27, 1999, then-Assistant Secretary for Indian Affairs, Department of the Interior ("DOI"), Kevin Gover sent a letter to the Tribe (hereinafter referred to as the "Gover Letter")

stating that the BIA's approval of the lease for the project was void for failing to fully comply with NEPA. The parties then entered into a joint stipulation of dismissal, and the Court dismissed the case without prejudice.

On February 3, 1999, Sun Prairie brought the first of two suits in the District of South Dakota, challenging BIA's decision to void the lease on the basis of Title 25 of the U.S. Code. The company also sought a determination that the FONSI complied with NEPA. The Plaintiffs intervened as defendants. Although the Tribe initially joined Sun Prairie as a plaintiff, it realigned itself as a defendant after a tribal election. The District Court enjoined the DOI from taking any action that would interfere with construction of the project. Rosebud Sioux Tribe v. Gover, 104 F. Supp. 2d 1194 (D. S.D. 2000).[7] During the period of the injunction, Sun Prairie completed and began operating two hog farm sites. However, on appeal, with Sun Prairie as the sole plaintiff, the Eighth Circuit Court of Appeals dismissed the case on the grounds that the plaintiff lacked prudential standing to enforce statutes intended to protect Indian interests. Rosebud Sioux Tribe v. McDivitt, 286 F.3d 1031 (8th Cir. 2002), *cert. denied*, 537 U.S. 1188 (2003).

Sun Prairie commenced the Sun Prairie v. Cason, No. 02-3030-RHB (D. S.D.), action on August 14, 2002, in the District of South Dakota against the United States and the Tribe. The

---

[7] In a brief subsequently filed with the Eighth Circuit Court of Appeals, the intervenors, then represented by Mr. Dougherty (counsel for the current Plaintiffs) stated that they did not challenge before the District Court the "September 16, 1998 lease approval", and further declared that in their role as defendants they did not wish to raise *any* affirmative claim. *See* Brief of Intervenors, Rosebud Sioux Tribe v. McDivitt, 286 F.3d 1031 (8th Cir. 2002), at 36-37, *available at* 2000 WL 33980399.

Complaint sought only equitable and declaratory relief against the United States, but significant monetary damages against the Tribe. Three of the present-day Plaintiffs, joined by George England, a purported member of the Concerned Rosebud Area Citizens and the Humane Farming Association, intervened as defendants. They were once again represented by Mr. Dougherty. Sun Prairie, in its complaint, alleged that when it began constructing one of the two hog harm operations, the Cottonwood Grove site, in accordance with the court order the Tribe began to interfere and delay construction of the project by, among other things, refusing to provide water and enacting permit and fee requirements, refusing to conduct sampling and monitoring, issuing stop work orders, and securing an ex parte temporary restraining order from a tribal court. The company contended that it had secured $40,000,000 in financing to construct and operate the two sites and had $5,000,000 in subordinated debt from individuals.

The United States and the Tribes, joined in by the intervenors, moved to dismiss Sun Prairie's complaint on the grounds of sovereign immunity and lack of subject matter jurisdiction. The intervenors did not challenge the legality of the BIA's NEPA determination or otherwise argue that the ongoing operation should be shut down. The Court dismissed 7 of the 14 counts but rejected the jurisdictional defenses. In upholding jurisdiction, the Court focused on whether the lease, as initially approved by the BIA, was still valid. Under the Court's reasoning, if the lease were still valid, and Sun Prairie was not afforded due process before its removal, the Court would have jurisdiction under the Larson doctrine, which can provide a limited sovereign immunity waiver for *ultra vires* or unconstitutional actions. *See* Larson v. Domestic & Foreign Comm. Corp., 337 U.S. 682 (1949); Jones v. Matthews, 539 F.2d 1111 (8th Cir. 1976).

In his June 5, 2003, decision, Judge Battey found that the United States had deprived Sun

Prairie of procedural due process. First, given the initial BIA lease approval, which included

agency adoption of the NEPA analysis, the Court found that Sun Prairie had a constitutionally

protected interest in the lease. Order at 11-16. Second, the Court determined that because the

BIA did not provide Sun Prairie proper notice and an opportunity to cure alleged NEPA

deficiencies prior to termination, the United States deprived the company of procedural due

process. Order at 7-9. Specifically, the Court relied on 25 C.F.R. §162.14 for the proposition that

the Secretary shall notify a lessee of a lease violation and permit the lessee 10 days in which to

agree to cure the violation. Settlement discussions then commenced. These discussions resulted

in the Order and Judgment by Consent. The intervenors were, as Judge Battey noted in his

Order, afforded an opportunity to object to the settlement, but they never responded. As noted in

Defendants' initial Memorandum, the Order and Judgment imposes considerable environmental

obligations upon Sun Prairie and affords the BIA a "reasonable time" to determine whether and

to what extent it will supplement prior NEPA documentation or otherwise issue a new NEPA

determination.


**IF THE ADMINISTRATIVE RECORD FOR DETERMINING COMPLIANCE WITH
NEPA WAS PREPARED IN 1999 AND THE AGENCY ISSUED ITS NEPA
DETERMINATION AT THAT TIME, AS PLAINTIFFS ALLEGE, ANY NEPA CLAIM
BASED ON THE FONSI OR THE SUBSEQUENT GOVER DETERMINATION IS
TIME-BARRED BY THE APPLICABLE STATUTE OF LIMITATIONS OR BY
LACHES OR MOOTNESS.**

**Statute of Limitations**

The Plaintiffs assert that they intend to seek summary judgment based on the

"administrative record that supported the September 16, 1998 decision of the BIA's South

Dakota representative", referencing receipt of the administrative record "related to the project EA and FONSI" by the Department of Justice on January 25 and 26, 1999. *See* Plaintiffs' Opposition to Defendants' Motion to Dismiss or, Alternatively, to Transfer Venue, at 11. If so, Plaintiffs are alleging that a NEPA determination that was made more than six years ago can be the sole basis of a declaratory judgment order today. The most recent date referenced by Plaintiffs that has any relationship to NEPA review is January 27, 1999, the date of the "Gover Letter". As more than 6 years have passed, and plaintiffs can point to no further federal action pursuant to NEPA, any claim that the statute was violated is time-barred.

The APA six-year statute of limitations, 28 U.S.C. §2401, governs in this case because NEPA does not provide a private right of action for alleged violations.  *See* Lujan v. National Wildlife Federation, 497 U.S. 871, 882 (1990). The statute of limitations for civil actions against the United States requires that "*every civil action* commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." Id. §2401(a) (emphasis added). As stated in Spannaus v. U.S. Department of Justice, 824 F.2d 52, 55 (D.C. Cir 1987):

> The law of this circuit is clear:  the words "every civil action" mean what they say. While a negative-pregnant dictum in a decade-old case weakly suggested a possible exception for "exclusively" equitable claims...this court's subsequent opinions clarify beyond dispute that §2401(a) applies to all civil actions whether legal, equitable or mixed.  *See, e.g.*, Calhoun v. Lehman, 725 F.2d 115, 116, 117 (D.C. Cir.1983); Walters v. Secretary of Defense, 725 F.2d 107, 111-14 (D.C. Cir.1983), *reh'g denied*, 737 F.2d 1038 (D.C. Cir.1984) (en banc) (per curiam);  Impro Products, Inc. v. Block, 722 F.2d 845, 849-50 & n.8 (D.C. Cir.1983), *cert. denied*, 469 U.S. 931 (1984); Gull Airborne Instruments, Inc. v. Weinberger, 694 F.2d 838, 844 & n.6 (D.C. Cir.1982);  White v. Civil Service Commission, 589 F.2d 713, 715 (D.C. Cir.1978) (per curiam), *cert. denied*, 444 U.S. 830 (1979); Oppenheim v. Campbell, 571 F.2d 660, 662 (D.C. Cir.1978).

Because "the statute of limitations is an integral part of the government's consent to suit . . . [it]

is an issue of subject matter jurisdiction that cannot be waived." <u>Walters v. Secretary of Defense</u>, 725 F.2d at 112 n.12.[8/]  As a condition of the waiver of sovereign immunity, the terms of the limitation must be strictly construed in favor of the United States and may "not [be] 'enlarge[d] ... beyond what the language requires.'" <u>Ruckelshaus v. Sierra Club</u>, 463 U.S. 680, 685 (1983) (*quoting* <u>Eastern Transp. Co. v. United States</u>, 272 U.S. 675, 686 (1927)).  The courts must give recognition to the Supreme Court's admonition that a statute of limitations is "more than a technical obstacle to be circumvented if possible." <u>Board of Regents v. Tomanio</u>, 446 U.S. 478, 484 (1980).  This limitation applies to cases which challenge final agency action pursuant to the APA and NEPA. <u>Humane Soc'y. of United States v. Hodel</u>, 840 F.2d 45, 50 (D.C. Cir. 1988) (applicable to NEPA claims); <u>Wind River Mining Corp. v. United States</u>, 946 F.2d 710, 712-13 (9th Cir. 1991).[9/]

A claim against the United States "first accrues when all the events have occurred which fix the alleged liability of the United States and entitle the claimant to institute an action." <u>Japanese War Notes Claimants Ass'n v. United States</u>, 373 F.2d 356, 358 (Ct. Cl.), *cert. denied*, 389 U.S. 971 (1967); <u>Brown Park Estates-Fairfield Dev. Co. v. United States</u>, 127 F.3d 1449, 1455 (Fed. Cir. 1997). Thus, the statute of limitations began to run in this case when the Plaintiffs knew or in the exercise of reasonable diligence should have known that they had a

_____

[8/] Filing within the statute of limitations is jurisdictional, since any waiver of sovereign immunity and consent to suit by the federal government is conditioned upon filing within the applicable statute of limitations. <u>Loudner v. United States</u>, 108 F.3d 896, 900 (8th Cir. 1997).

[9/] *See* <u>Sierra Club v. Pena</u>, 915 F. Supp. 1381, 1392 (N.D. Ohio 1996); <u>Broadened Horizons Riverkeepers v. U.S. Army Corps of Engineers</u>, 8 F. Supp. 2d 730, 736, n.9 (E.D. Tenn. 1998) (applicable to NEPA claims). *See also* <u>Jersey Heights Neighborhood Ass'n v. Glendening</u>, 174 F.3d 180 (4th Cir. 1999) (applicable to NEPA claims); <u>Southwest Williamson County Community Ass'n v. Slater</u>, 173 F.3d 1033 (6th Cir. 1999) (same); <u>Sierra Club v. Slater</u>, 120 F.3d 623 (6th Cir. 1997).

claim for an alleged violation of NEPA–certainly as of January 27, 1999. Yet even though the Plaintiffs knew that the BIA had concluded that the initial NEPA analysis was insufficient, they stood by after Sun Prairie began construction and operation of the two existing facilities and afterwards.

The Plaintiffs did not thereafter seek a judicial determination that the then-operational facilities were operating illegally, much less that their ongoing operation violated NEPA. They instead sided with the federal defendants in the litigation brought by Sun Prairie in which it alleged that the Gover Letter effected a violation of its procedural due process. At no time during the proceeding did the then-intervenors ask Judge Battey to issue a ruling finding that the lease was invalid for lack of compliance with NEPA, or to enjoin operation of the facilities on the basis that necessary environmental impact analysis had not occurred. Nor did the Plaintiffs, after receipt of the proposed Consent Judgment, make any effort to object or to inform the Court as to the alleged insufficiency of the NEPA analysis, even though the Court's previous ruling dealt with the NEPA issue as it related to the due process rights of Sun Prairie. The Plaintiffs knew or should have known that no NEPA decisionmaking or relevant federal agency analysis occurred beyond January 27, 1999. This case, therefore, is time-barred.

**Mootness**

Two facilities are in operation, and the others originally proposed by Sun Prairie when the FONSI was issued will not be constructed. Plantiffs' NEPA claim is moot. Because NEPA imposes only a procedural requirement, numerous courts have found that if the project is completed, the agency action is also "complete," and a judicial challenge to it is moot. *See, e.g.*, Knaust v. City of Kingston, 157 F.3d 86 (2d Cir. 1998); Neighborhood Transp. Network, Inc. v.

Pena, 42 F.3d 1169 (8th Cir. 1994); Oregon Nat. Res. Council, Inc. v. Bureau of Reclamation, 37

F.3d 1414 (9th Cir. 1994); Neighbors Organized to Insure Sound Environment, Inc. v. McArtor,

878 F.2d 174 (6th Cir. 1989); Natural Resources Defense Council v. Morton, 337 F. Supp. 170

(D.D.C. 1972). When a case becomes moot, a federal court no longer has jurisdiction over the

matter, as the "exercise of judicial power depends upon the existence of a case or controversy."

DeFunis v. Odegaard, 416 U.S. 312, 316 (1974).  The rule that courts lack "jurisdiction to

consider the merits of a moot case is a branch of the constitutional command that the judicial

power extends only to cases or controversies."  McCormack v. Powell, 395 U.S. 486, 496 n.7

(1969).[10]

The Supreme Court in Tennessee Valley Auth. v. Hill, 437 U.S. 153 (1978), noted that a

NEPA-based judicial inquiry is meaningless once the project is complete. As the Tenth Circuit

has stated, "[t]he crucial question is whether 'granting a present determination of the issues

offered . . . will have some effect in the real world.'" Citizens for Responsible Government

Political Action Comm. v. Davidson, 236 F.3d 1174, 1182 (10th Cir. 2000) (quoting Kennecott

Utah Copper Corp. v. Becker, 186 F.3d 1261, 1266 (10th Cir. 1999)). No "real world" benefit

---

[10] The jurisdiction of the federal courts extends only to live cases and controversies.  *See* U.S.
Const. art. III, §2.  That requirement persists throughout all stages of the litigation.  Arizonans
for Official English v. Arizona, 520 U.S. 43, 67 (1997) ("[A]n actual controversy must be extant
at all stages of review."); McAlpine v. Thompson, 187 F.3d 1213, 1216 (10th Cir. 1999).  A
federal court lacks jurisdiction "to give opinions upon moot questions or abstract propositions, or
to declare principles or rules of law which cannot affect the matter in issue before it."  Church of
Scientology of Calif. v. United States, 506 U.S. 9, 12 (1992).  *See also* Defunis v. Odegaard, 416
U.S. 312, 316 (1974) (*quoting* North Carolina v. Rice, 404 U.S. 244, 246 (1971)).  A court must
dismiss a lawsuit as moot where an intervening event makes it impossible to grant *effective*
relief.  Church of Scientology of Calif., 506 U.S. at 12; Mills v. Green, 159 U.S. 651, 653
(1895); Burlington Northern Railroad Co. v. Surface Transportation Board, 75 F.3d 685, 688
(D.C. Cir. 1996);  State of Nevada v. Watkins, 943 F.2d 1080, 1083-1084 (9th Cir. 1991).

can obtain from *requiring* Defendants to engage in procedural environmental impact analysis of the *potential* impacts of facilities that have, in accordance with a court order, long been in operation. No lawful remedy can "correct" a purported procedural violation regarding a statute that clearly operates to provide for pre-construction review. See, e.g., <u>Citizens & Landowners Against the Miles City/New Underwood Powerline v. Department of Energy</u>, 683 F.2d 1171 (8th Cir. 1982); <u>Concerned Citizens on I-190 v. Secretary of Transportation</u>, 641 F.2d 1 (1st Cir. 1981); <u>Save Our Wetlands, Inc. v. U.S. Army Corps of Engineers</u>, 549 F.2d 1021 (5th Cir.), *cert. denied*, 434 U.S. 836 (1977).

Two facilities have been constructed and are in operation, compared to the 13 that were originally contemplated when the NEPA analysis was conducted. Those facilities are the ones complained of by the Plaintiffs. The additional 11 facilities will now *never* be constructed, thanks to the Consent Order approved and supervised by Judge Battey. As noted below, BIA has not yet determined whether and to what extent it will conduct new or expanded NEPA procedural environmental impact analysis regarding the two operational facilities. Defendants ought not, in any event, be *required*–particularly by this Court, which is being asked to set aside a Consent Order monitored by Judge Battey, with regard to facilities whose construction and operation were specifically authorized by a federal district court--to engage in further NEPA potential impact review.

### Laches

Even if the statute of limitations is not applicable, the equitable doctrine of laches applies to bar Plaintiffs' claim. "An environmental action may be barred by the equitable doctrine of laches if (1) there has been unreasonable delay in bringing suit, and (2) the party asserting the

defense has been prejudiced by the delay." Park County Resource Council, Inc. v. United States,

Department of Agriculture, 817 F.2d 609, 617 (10th Cir. 1987). *See also* Costello v. United

States, 365 U.S. 265, 282 (1961). *See* Independent Bankers Association v. Heimann, 627 F.2d

486 (D.C. Cir. 1980) (per curiam). This defense is based "on the principle that equity aids the

vigilant, not those who sleep on their rights." Dalsis v. Hills, 424 F. Supp. 784, 788 (W.D.N.Y.

1976). Laches is particularly applicable if "substantial work on the project had been completed

before suit was brought." Coalition for Canyon Preservation v. Bowers, 632 F.2d 774, 779 (9th

Cir. 1980).

It is well established that NEPA claims are subject to laches. Jicarilla Apache Tribe v.

Andrus, 687 F.2d 1324, 1338 (10th Cir. 1982). While the doctrine may be invoked sparingly in

other types of environmental cases, Park County Resource Council, 817 F.2d at 617, it can and

has been invoked in numerous NEPA cases to bar unreasonably delayed claims:

> In most cases in which laches has been applied in the NEPA context, the project
> allegedly significantly affecting the quality of the human environment was nearly
> completed, rendering preparation of an EIS redundant. *See, e.g.*, Ogunquit
> Village Corp., 553 F.2d at 245 (project completed); Save our Wetlands v. ***,
> 549 F.2d at 1028 ($26 million expended and large portion of project substantially
> completed); Shiffler v. Schlesinger, 648 F.2d 96, 104 (3d Cir. 1977) (project 85 to
> 90% complete and irreversible commitment of secondary sources found);
> Township of Parsippany Troy Hills v. Costle, 503 F. Supp. 314, 320 (D. N.J.
> 1979) (project 80% completed), *aff'd*, 639 F.2d 776 (3d Cir. 1980), Michigan v.
> City of Allen Park, 501 F. Supp. 1007, 1017 (E.D. Mich. 1980) (project 80%
> completed), *aff'd*, 667 F.2d 1028 (6th Cir. 1981), *cert denied*, 456 U.S. 927
> (1982).

Id. at 818-19. *See also* Apache Survival Coalition v. United States, 21 F.3d 895, 910 (9th Cir.

1994) (applying NEPA laches analysis, the court dismissed NHPA claims where injunction not

sought until long after construction was underway).[11]

The Plaintiffs were active participants in the NEPA process and in subsequent litigation, both here and in South Dakota. While the Plaintiffs slept on any claim of a NEPA violation, Sun Prairie has invested tens of millions of dollars in the two operating sites. The Tribe depends on those facilities for the livelihood of its members in one of the most economically depressed areas of the Nation. The facilities were constructed and became operational years ago, and short of outright closure those steps are irreversible.[12] They are, and have been, subject to all applicable

---

[11] While "mere lapse of time does not amount to laches," Jicarilla Apache Tribe, 687 F. at 1338, the passage of time is an important factor to be considered in a laches analysis:

> Furthermore, we have no difficulty finding that the six year period between 1985, when the Tribe first was solicited for input, and the date of filing suit constitutes unreasonable delay, particularly when the Coalition's filing came two years after the relevant agency action. *See, e.g.*, [Id.] at 1338-39 (three year delay resulted in laches), National Parks, 679 F. Supp. at 53 (same), City of Rochester, 541 F.2d at 944 (finding inexcusable delay when suit was filed less than two years after the relevant agreement), Friends of Yosemite, 420 F. Supp. at 397 (finding sufficient delay when suit was filed "over 3 years after the project was publicized and over 2 years after [the relevant agency action]"), Smith v. Schllesinger, 371 F. Supp. 559, 561 (C.D. Cal. 1974) (finding inexcusable delay when suit was filed over seven months after work on a project had begun). It is also relevant that the Coalition did not move for injunctive relief until eight months following the filing of the complaint, long after construction was underway. *See* Citizens & Landowners Against the Miles City/New Underwood Powerline v. Secretary U.S. Department of Energy, 683 F. 2d 1171, 1176-77 (8th Cir. 1982), Clarke, 342 F. Supp at 1329. In short, a finding of inexcusable delay in this case is especially appropriate because "[t]he history leading up to the filing of this case ... is a clear case of parties sleeping on their rights." In re Citizens, 513 F. Supp. at 264; Of Portland Audubon Society, 884 F.2d at 1241 (expressing concern that "a plaintiff [might] 'sandbag[]' a defendant by bring a late suit").

Apache Survival Coalition, 21 F.3d at 910.

[12] *See* City of Rochester v. U.S. Postal Serv., 541 F.2d 967, 977 (2d Cir. 1976) (finding "several months of correspondence" insufficient to preclude a laches); In re Citizens, 513 F. Supp. 257, 264 (D. S.D. 1981) (finding inexcusable delay despite a "few oral complaints" made shortly after the relevant agency action), *aff'd*, 683 F.2d 1171 (8th Cir. 1982); Smith v. Schlesinger, 371 F. Supp. 559 (C.D. Cal. 1974) (finding inexcusable delay when suit filed over seven months after

tribal, state, and federal environmental requirements, in addition to specific measures and procedures detailed in the Consent Judgment. Now alleging a violation that purportedly occurred in 1999, Plaintiffs seek a determination that Judge Battey was incorrect in authorizing the revised lease, asking this Court to assume jurisdiction over its legality (and, thereby, over the Consent Order and Judgment) and to issue an order declaring the lease invalid. Such an order would, at a minimum, undermine the consent decree the United States negotiated. It could have a profound impact upon the ability of Sun Prairie to continue operations. Sun Prairie might be put into default with its lenders, leading potentially to closure or abandonment of the facilities. The Tribe could suffer both economically and due to environmental impacts. Payments to the Tribe, which were increased under the terms of the modified lease, could cease. The Tribe's homelands would be harmed if closure or abandonment of the facilities has adverse environmental effects, particularly upon water quality.

---

project was announced and when project was 35-40 percent complete). There is no requisite length of time to affirm a laches defense; rather, it "depends on the circumstances" of each case. A.C. Aukerman Co. v. R.L. Chaides Constr. Co., 960 F.2d 1020, 1023 (Fed. Cir. 1992) (en banc)), 960 F.2d at 1032 (*citing* Galliher v. Cadwell, 145 U.S. 368, 373 (1892)). In fact, federal courts have often dismissed actions on laches grounds even when the complaint was filed less than six years after the cause of action accrued. *See, e.g.*, Deering v. United States, 620 F.2d 242, 246 (1980) (en banc) (plaintiff filed on "last day allowed by ... statute of limitations"; plaintiff could not "demonstrate ... lack of prejudice" or provide an "excuse[] for delay in filing"; Court held plaintiffs' case barred by laches); Mariner v. United States, 1 Cl. Ct. 430, 433-34, *aff'd mem.*, 727 F.2d 1118 (Fed. Cir. 1983) ("three days shy of ... period of limitations" sufficient to bar claim due to laches, citing other cases of shorter duration); Brundage v. United States, 205 Ct. Cl. 502, 504 F.2d 1382, 1385 (1974) (three years and eight months from accrual of claim; case dismissed on laches). Indeed, the Supreme Court has held that even a delay of less than one year was sufficient to preclude recovery. Norris v. United States, 257 U.S. 77, 80-81 (1921) ("no fact is found explaining [plaintiff's] failure to assert his [claim] for the period of 11 months and a little over; [p]ublic policy requires reasonable diligence upon the plaintiff's part, which we think the findings in this record do not disclose."), *aff'g*, 55 Ct. Cl. 208 (1920). *See also* Alpert v. United States, 161 Ct. Cl. 810, 820-21 (1963) (listing numerous Court of Claims cases in which delay by plaintiffs of less than six years was held sufficient to bar claim under doctrine of laches).

The Plaintiffs do not tell us precisely what remedy they have in mind given the present state of affairs. They cannot seriously seriously expect this Court or any other to direct BIA to order Sun Prairie to undue their multi-million dollar constructions. Nor is it reasonable for facilities to come to a halt because a court has invalidated the lease as amended by the Consent Order and Judgment. The best way to avoid such impacts is to allow Sun Prairie to operate consistent with the terms of the Consent Order and Judgment, provisions which call for annual payments to the Tribe and environmental controls that *exceed* those imposed upon large-scale animal feeding operations by federal environmental regulation.

The Plaintiffs contend, in paragraph 36 of their Complaint, that "re-approval of each lease constitute[s] major federal action." Judicial approval of a settlement agreement modifing the terms of a BIA does not constitute "major federal action" for NEPA or for any other judicially cognizable purpose. If it does, however, Plaintiffs' allegation is nonetheless irrelevant and cannot make this action timely or justiciable, either under the statute of limitations or by defeating application of the doctrines of laches or mootness. Plaintiffs have no more prudential standing to sue on the basis on an alleged violation of the BIA Indian leasing regulations and statutes than did Sun Prairie, because those provisions act for the benefit of Indian tribes. Rosebud Sioux Tribe v. McDivitt, 286 F.3d at 1036-37. If the Plaintiffs have standing at all and any right of action at present, it is to sue regarding non-economic impacts from an alleged violation of *NEPA*. Plaintiffs do not assert and cannot contend that any NEPA analysis or administrative determination, whether reflected in what they contend constitutes the "administrative record" or otherwise, was made by BIA after January 27, 1999.

In sum, Plaintiffs have unreasonably delayed, and for this Court to entertain this action

and grant their requested relief would cause great prejudice to the defendants, Sun Prairie, and the Tribe.   This court should exercise its equitable powers to dismiss Plaintiffs' tardy attempt to use NEPA to interfere with operation of the facilities.[13]

## ALTERNATIVELY, THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER THE COMPLAINT ON FINALITY, RIPENESS, AND EXHAUSTION GROUNDS.

Alternatively, if the Order and Judgment by Consent means what it says, Plaintiffs' lawsuit should still be dismissed, on the grounds that this Court lacks subject matter jurisdiction on finality, ripeness, and exhaustion grounds. The BIA has not determined whether it will take any step to engage in further NEPA review regarding the two operational facilities.[14] As noted in Defendants' Initial Memorandum and in the Consent Order and Judgment, BIA is to work, and indeed is currently engaged in activity with Sun Prairie and the Tribe, on a number of environmental-related matters, such as a pilot study for land application of nutrients, agreed-upon financial security arrangements, detailed closure procedures, and facility monitoring. The agency may decide to require a revised impact analysis or an entirely new one, or it may do nothing. The Judgment specifically provides that the BIA may review prior NEPA documentation and supplement prior analyses, if appropriate. Judgment by Consent, ¶ 9. That determination can be made within a "reasonable time," which surely has not passed with regard to a Order that was entered in  May 2005. Yet Plaintiffs ask this Court to assume immediate

---

[13] Even if this court concludes that plaintiffs tardiness is not enough to justify dismissal based on laches, the court can and should take this factor into account in its balancing of harms.

[14] It should be specifically noted that Defendants do not concede that inaction by BIA is reviewable.

16

jurisdiction over the interpretation of a Consent Judgment that Judge Battey specifically

contemplated would be reviewed, if necessary, by him in the District of South Dakota. And they

ask this Court to rule *now*, on the basis of a forthcoming Motion for Summary Judgment

premised on the 1999 NEPA determination, regardless of the fact that BIA may undertake new

or supplemental NEPA analysis.

Throughout Plaintiff's Opposition, they assume, without ever demonstrating, that their

claims are ripe for judicial review, and that the 1999 NEPA determination is the final and only

federal action under the statute that need–or *could*–be considered by this Court. Indeed, plaintiffs

base their entire argument on the merits on such an assumption. Plaintiffs bear the burden of

demonstrating this Court's subject matter jurisdiction over their claims, however, and where, as

here, they have failed to make such a showing, their claims must be dismissed because the Court

lacks jurisdiction to hear them.

Plaintiffs bring this suit by evoking the waiver of sovereign immunity provided under the

APA. The APA's waiver, however, does not provide *carte blanche* for parties to bring to federal

court any and all disagreements with agency decisions. Rather, parties may only challenge final

agency actions as permitted by the APA and within the constraints imposed by Article III and

prudential limitations on judicial review. The Supreme Court has held that a court should not

review the merits of a claim until it has determined that it has jurisdiction to do so. Steele Co. v.

Citizens for a Better Env't, 523 U.S. 83, 93-94 (1998). A party invoking federal jurisdiction,

once challenged, has the burden of proving its existence. Georgiades v. Martin-Trigona, 729

F.2d 831, 833 n.4 (D.C. Cir. 1984).

Here, principles of finality, ripeness and exhaustion preclude this Court's review of the

1999 determination, insofar as the Order and Judgment by Consent specifically grants the BIA a "reasonable time" to review prior NEPA determination and supplement prior analyses if appropriate. These doctrines often overlap, and in this case the same considerations of timing and procedural posture demonstrate that subject matter jurisdiction is lacking under all three theories.[15/]

The criteria for final agency action were set forth by the Supreme Court in Bennett v. Spear, 520 U.S. 154 (1997). The Court explained that, as a general matter, two conditions must be satisfied for agency action to be "final":

> First, the action must mark the "consummation" of the agency's decisionmaking process – it must not be of a merely tentative or interlocutory nature. And, second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow."

520 U.S. at 177-78 (citations omitted). "Ripeness," while implicating these finality concerns, is primarily concerned with the closely related goal of preventing judicial review of hypothetical or abstract problems that may not come to pass. See Kenneth Culp Davis & Richard J. Pierce, Jr., 2 Administrative Law Treatise (3d ed. 1994) §15.12.[16/] The exhaustion doctrine comes into play

---

[15/] See Ukiah Valley Med. Ctr. v. FTC., 911 F.2d 261, 263-64 n.1 (9th Cir. 1990) (finality problems often arise where law of exhaustion "joins or overlaps" with law of ripeness).

[16/] Ripeness is rooted in Article III's requirement of "case or controversy" and in prudential considerations favoring orderly conduct of administrative and judicial processes. Blanchette v. Connecticut General Ins. Corp., 419 U.S. 102, 138 (1974). The doctrine is designed "to prevent the courts, through avoidance of premature litigation, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." Abbott Laboratories v. Gardner, 387 U.S. 136, 148-49 (1967). NEPA simply guarantees in certain instances a particular procedure, not a particular result. See 42 U.S.C. §4332 (requiring that agencies prepare environmental impact statements where major agency action would significantly affect the environment). Hence a person with standing who is injured by a failure to comply with the NEPA procedure must complain of that failure at the time

where a party has yet to participate in or complete an available administrative proceeding that, if

pursued, may afford it the relief it desires.  Id. §15.1 at 305-06 (if party "has not yet exhausted an

available administrative remedy, the agency's action is not yet final.").

**Finality**

Turning first to finality issues, Plaintiffs' Complaints are brought under the APA, which

authorizes judicial review only of "final agency action."  5 U.S.C. §704.  To be final, an action

must mark the "consummation" of the agency's decision making process and be one by which

"rights or obligations have been determined," or from which "legal consequences will flow."

Bennett, 520 U.S. at 177-78.  In the NEPA context, for purposes of judicial review the relevant

"consummation" of the agency's decisionmaking process comes when a FONSI or an

Environmental Impact Statement ("EIS") is issued. In the specific case of NEPA, the Council on

Environmental Quality ("CEQ") regulations provide additional specific guidance on when there

is final agency action.  The CEQ regulations on NEPA are generally given considerable

deference by the courts.  *See* Save Our Ecosystems v. Clark, 747 F.2d 1240, 1244 (9th Cir.

1984).  These rules state:

> It is the Council's intention that judicial review of agency of agency compliance with
> these regulations not occur before an agency has filed the final environmental impact
> statement, or has made a final finding of no significant impact . . ., or takes action that
> will result in irreparable injury.  Furthermore, it is the Council's intention that any trivial
> violation of these regulations not give rise to any independent cause of action.

40 C.F.R. §1500.3. Thus, for agency action to be final under NEPA, it must satisfy both the

Supreme Court's general criteria in *Bennett*, and the CEQ's statute-specific criteria.

---

the failure takes place, for the claim can never get riper. The D.C. Circuit long ago found that a
"time limitation on petitions for judicial review * * * can run only against challenges ripe for
review." Baltimore Gas & Electric Co. v. ICC, 672 F.2d 146, 149 (D.C. Cir. 1982).

Consistent with the CEQ regulation, numerous courts have refused to review claims brought before agencies have prepared final NEPA documents. *See, e.g.,* Bennett Hills Grazing Ass'n v. United States, 600 F.2d 1308 (9th Cir. 1979) (reversing district court, which had evaluated adequacy of comment period on draft environmental impact statement; finding no final agency action until final statement issued); Committee Against R.R. Relocation v. Adams, 471 F. Supp. 142, 146 (E.D. Ark. 1979) ("It is well established that draft EIS's are not subject to judicial review.").

Here, other than pure speculation on the part of Plaintiffs, there is no determination by BIA regarding new or revised NEPA analysis, much less a final NEPA determination based on that analysis. For the same reasons, the ultimate rights of Plaintiffs' members, if any, have yet to be determined. It is only after passage of a "reasonable time" that it can even be determined whether a new NEPA determination will be made, much less its content. Other than pure guesswork, there is no way to predict whether, or on what basis, BIA will act. As the court in Wisconsin Gas v. FERC, 758 F.2d 669 (D.C. Cir. 1985), observed, "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will in fact occur. The movant must provide proof that the harm has occurred in the past and is likely to occur again, or proof indicating that the harm is certain to occur in the near future." Id. at 674; *see also* Reynolds Metals Co. v. FERC, 777 F.2d 760, 763 (D.C. Cir. 1985) (same); Connecticut v. Massachusetts, 282 U.S. 660, 674 (1931). To find that there is "final agency action" subject to challenge, this Court would have to ignore the language of the Consent Order and Judgment and Judge Battey's continuing jurisdiction over it, and determine the agency's compliance with NEPA based solely on a decision issued in 1999 that it specifically reserved the right to review.

20

**Ripeness**

Likewise, any claims by Plaintiffs regarding any additional analysis and documentation that may be undertaken by the BIA as part of a NEPA environmental re-evaluation process are unripe until the agency has either completed the process or a "reasonable time" has passed. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 882 (1990); Abbott Laboratories v. Gardner, 387 U.S. 136, 149 (1967); Vine Street Concerned Citizens, Inc. v. Dole, 604 F. Supp. 509, 511-12 (E.D. Pa. 1985).  The environmental re-evaluation process--including the preparation of an EA, at a minimum--is a highly technical and factual matter that implicates the expertise of the agency; therefore, it should be reviewed and determined by the agency in the first instance, without interference or interruption by plaintiffs. *See, e.g.*, Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 377 (1989); Baltimore Gas & Electric Co. v. NRDC, 462 U.S. 87, 103 (1983).[17] Moreover, from the agency's perspective, immediate judicial review directed at the

---

[17] The Supreme Court, in Ohio Forestry Assoc., Inc. v. Sierra Club, 523 U.S. 726, 733 (1998), articulated a three-part test to assess ripeness. It is clear upon an examination of the Ohio Forestry test that, assuming BIA is allowed to proceed according to the Consent Order and Judgment, Plaintiffs cannot show that their claim is ripe. Delayed review will not cause any hardship to the Plaintiffs, who have for years known of the presence of the facilities. Similarly, Plaintiffs cannot demonstrate that they will be prejudiced by allowing their claim to ripen. If Plaintiffs wish to challenge a new, final agency action, they may do so at the appropriate time. If they seek to claim that BIA has not taken any further steps under NEPA after a "reasonable time" has elapsed and that such inaction is illegal, they may file a challenge "at the time the failure takes place." Id. at 737. Secondly, Plaintiffs' challenge may be futile, as they may ultimately be satisfied with any future actions taken by BIA. Finally, the Court clearly would benefit from delaying judicial review for further factual development. At present, there is only a rescinded BIA NEPA determination to assess, plus Plaintiffs' speculative assertion that BIA is not obligated to act under the Consent Judgment. Accordingly, further factual development would be necessary before any meaningful judicial review could occur. See Town of Fairview v. U.S. Dep't of Transp., 201 F. Supp. 2d 64, 75-77 (D.D.C. 2002) (NEPA claim not ripe where state of factual development in record precluded court from deciding intelligently if defendant had met its obligations).

lawfulness of a NEPA determination it rescinded in 1999 and has not had the opportunity to reevaluate would unmistakably constitute premature review, denying "the agency an opportunity to correct its mistakes and to apply its expertise." FTC v. Standard Oil Co. of Cal., 449 U.S., 232, 242 (1980). To allow the Plaintiffs to proceed now would prejudice the Defendants.[18] Finally, to the extent that further federal analysis under NEPA occurs, Plaintiffs clearly have not exhausted their available administrative remedies. They could, as they did before, participate in any renewed NEPA process.


**CONCLUSION**

Plaintiffs' arguments come down to the stubborn assertion that, because they now seek a ruling from this District in what amounts to a blatant act of forum shopping, venue should lie here and this Court should proceed with an adjudication on the merits–despite the existence of a Consent Order and Judgment vesting continued jurisdiction over the lease, as amended, with Judge Battey in the District of South Dakota, and regardless of the fact that BIA has a "reasonable time" pursuant to that Order to determine whether and to what extend to supplement its previous NEPA analysis. They are incorrect, for all the reasons noted above and in Defendants' initial Memorandum. The Complaint should be dismissed.


Respectfully submitted,

KELLY A. JOHNSON
Assistant Attorney General
Environment & Natural Resources Division

---

[18] Defendants also note that dual jurisdiction over the interpretation of the Consent Order and Judgment could lead to conflicting determinations.

_____/S/_____
John H. Turner, Jr.
Trial Attorney
U.S. Department of Justice
Environment & Natural Resources Division
Indian Resources Section
P.O. Box 44378
L'Enfant Plaza Station
Washington, D.C. 20026-4378
Street Address:
601 D Street, N.W., Suite 3507
Washington, DC 20004
Telephone: (202) 305-0269
Facsimile: (202) 305-0271
E-mail: john.turner@usdoj.gov